

August 21, 2023

**Via U.S. Mail**

Hon. Frederick J. Scullin, Jr.
Senior United States District Judge
Federal Building and U.S. Courthouse
12th Floor
P.O. Box 7336
Syracuse, New York 13261-7336

*Re:*  *Brownell v. Starbucks Coffee Co.*, Civil Action No. 5:22-CV-1199(FJS/ATB)

Dear Honorable Judge Scullin:

I am an Assistant General Counsel at Ashley Furniture Industries, LLC ("AFI").  I write in connection with this Court's Order to Show Cause regarding Rule 11 sanctions against Spencer Sheehan in the above-referenced matter (Doc. No. 25, the "Show Cause Order").  Much like the conduct described in the Show Cause Order, last year Mr. Sheehan filed a plainly frivolous class action against AFI in the Northern District of Florida.  When Mr. Sheehan was asked to dismiss his suit based on undisputed facts establishing the frivolity of his claims, he refused and curtly responded:

> So go file your rule 11 motion [sic] I hear such sanctions threats from people like you all day long.[1]

The fact that Mr. Sheehan is so frequently threatened with Rule 11 sanctions underscores this Court's concern, and his email evidences a sense of pride and bravado that has no place in the practice of law.  As set forth in more detail below, Mr. Sheehan's months-long refusal to dismiss his baseless claims against AFI forced it to incur more than $115,000 in legal fees.  Just days before AFI's filing of a motion to dismiss, Mr. Sheehan dismissed his suit.  AFI respectfully submits these facts further demonstrate a pattern of sanctionable and unethical conduct that this Court should not countenance.

<u>The Lawsuit Against AFI</u>

In September 2022, Mr. Sheehan filed a multi-state putative class action against AFI, claiming that it engaged in illegal conduct regarding the sale, issuance, and administration of furniture protection plans.  Mr. Sheehan's complaint was based on a fiction, and he knew it – or at

---

[1] True and accurate copies of referenced email communications are attached hereto as Exhibit A.  A copy of the Complaint Mr. Sheehan filed against AFI is attached hereto as Exhibit B.



least should have known it – at the time of filing.  <u>First</u>, AFI manufactures and sources furniture. It engages in literally no retail operations.  <u>Second</u>, and relatedly, AFI does not engage in the sale, issuance, or administration of furniture protection plans.  <u>Third</u>, the furniture protection plan purchased by Mr. Sheehan's client was issued by an entity named CNA Warranty Services of Florida, Inc. ("CNA"), and administered by Guardian Protection Products, Inc. ("Guardian"). <u>Fourth</u>, the retail furniture store at which Mr. Sheehan's client purchased the furniture protection plan was owned an operated by an independent company that is unaffiliated with AFI.

The day after suit was filed, the undersigned had a discussion with Mr. Sheehan, which was immediately followed by an email stating:

> As I indicated during our call, Ashley Furniture Industries, LLC is a manufacturer of furniture. It does not operate any retail stores, or the website www.ashleyfurniture.com. Another entity, Ashley Global Retail, LLC, does operate certain enterprise stores. The location at issue in your complaint, however, is not one of those. That particular store in Tallahassee is owned and operated by a relatively small independent licensee. To the extent this lawsuit goes anywhere, it will need to proceed against that licensee, and not Ashley Global Retail or Ashley Furniture Industries. We can substantiate what I'm relaying here through an officer's affidavit, if necessary. In other words, there is no factual or legal basis to proceed against any Ashley entity.

Mr. Sheehan replied weeks later, stating "it's my belief that the main Ashley entity bears at least some liability in theory for the practices alleged notwithstanding that the store in question is independently owned.  If the local store entity will be added eventually that's fine too."  Mr. Sheehan attempted to quash further dialogue, writing "[l]est you feel the need to respond with blustering I'm not interested in hearing it."

The undersigned yet again reiterated in writing that "no legal or factual basis" existed to maintain the lawsuit against AFI, and even cautioned Mr. Sheehan that "[t]his email exchange will be our primary exhibit when we seek fees and costs associated with getting [AFI] – a manufacturer of furniture that does not own or operate <u>any</u> retail locations – dismissed form this matter."  Mr. Sheehan's response was to encourage the filing of a Rule 11 motion.

Given Mr. Sheehan's refusal to dismiss AFI, we had no choice but to engage outside counsel to draft a motion to dismiss, which ultimately led to more than $115,000 in legal fees. Consistent with his pattern in other cases, Mr. Sheehan dismissed the lawsuit just days before AFI filed its motion.[2]

Mr. Sheehan's Failures

It is somewhat ironic that Mr. Sheehan's counsel represents to this Court that "[p]rior to commencing any action, [he] undertakes an independent investigation" and that "[f]ollowing all

---

[2] The Notice of Voluntary Dismissal dated December 20, 2022 is attached hereto as Exhibit C.



of this independent research and testing, and determining there could be viable claims, Mr. Sheehan prepares and files the Complaint…" (Doc. No. 34, at 2). That simply cannot be true in the case of the AFI litigation. Even a cursory investigation would have confirmed the identity of the relevant actors.

As stated on the face of the furniture protection plan, the issuer is third-party CNA, and the administrator is third-party Guardian.[3] Mr. Sheehan's Complaint admitted that his client submitted her claim to "third-party provider, Guardian" and that "adjusters at Guardian" denied the claim. (Compl. ¶¶ 15 & 85). Moreover, correspondence sent to Mr. Sheehan's client denying her claim repeatedly stated it was from Guardian. Similarly, Mr. Sheehan recognized in the Complaint that many Ashley HomeStores are "independently licensed and operated," (Compl. ¶ 57), and his client's delivery receipt identified the independent owner of that store ("Turner Ashley Homestore").

Despite the details provided by the undersigned and easily accessible from his client's transaction documentation, for months Mr. Sheehan neither withdrew nor amended the complaint. Based on his intransigence, AFI was forced to hire counsel and prepare a motion to dismiss the sprawling eight-count complaint containing bogus allegations regarding AFI's role. During the required meet and confer process, and for the first time, Mr. Sheehan finally took an interest in the undisputed facts substantiating AFI's position. On December 19, 2022, more than three months after his first call with the undersigned, Mr. Sheehan wrote "I looked into it [sic] I have done independent research into the company and nature of the relationships with the local stores. . . . My intention is not presently to proceed against the current defendant." The fact that Mr. Sheehan allegedly did an investigation *after* Ashley invested significant resources to expose his sham lawsuit only underscores that he had no good faith basis to exert the claims in the first instance. It also undermines his counsel's claim that Mr. Sheehan conducts a robust investigation prior to commencing suit.[4]

\*     \*     \*

AFI respectfully submits that it was one of apparently many victims of Mr. Sheehan's unethical and sanctionable pattern of filing frivolous lawsuits against deep pocket defendants in the hopes of extracting financial gain. Mr. Sheehan failed to investigate the merits of his lawsuit before filing, and he consciously disregarded facts demonstrating that he was targeting the wrong entity. When these and other indisputable facts were brought to his attention post-filing, he refused to acknowledge them for months while AFI incurred significant legal fees.

---

[3] Attached hereto as Exhibit D.

[4] Also ironic is counsel for Mr. Sheehan stating that his discontinuance of certain matters "may be . . . for a variety of reasons, including . . . disclosure by the defendant of certain information which renders the action unlikely to succeed . . . ." (Doc. No. 34, at 3, n.1). In AFI's case, Mr. Sheehan was apprised of such facts (at the very latest) *the day after he filed suit*. He was even offered an affidavit on those topics, but declined. Actions speak louder than words, and Mr. Sheehan's conduct demonstrates that notwithstanding his counsel's argument to the contrary, neither fact nor law will stand in his way of commencing and continuing litigation.



Mr. Sheehan's conduct is simply unbecoming of a lawyer, and he should be stopped. To the extent the Court has any questions or concerns, we are happy to address them. My email address is Ramicone@ashleyfurniture.com.

Respectfully submitted,

Robert Amicone
Assistant General Counsel

cc:     Paul G. Ferrara (pferrara@ccf-law.com)
        Paul W. Garrity (pgarrity@sheppardmullin.com)
        Sascha Henry (shenry@sheppardmullin.com)
        Robert J. Guite (rguite@sheppardmullin.com)

# Exhibit A

| | |
|---|---|
| **From:** | Spencer Sheehan |
| **To:** | Amicone, Robert |
| **Cc:** | Green, Lexie |
| **Subject:** | Re: Grasty/Ashley |
| **Date:** | Friday, September 30, 2022 3:09:39 PM |

So go file your rule 11 motion I hear such sanctions threats from people like you all day long

On Fri, Sep 30, 2022 at 2:52 PM Amicone, Robert <RAmicone@ashleyfurniture.com> wrote:

Spencer:

There is no legal or factual basis to maintain a lawsuit against the entity against which you filed this lawsuit, notwithstanding your unfounded "belief" to the contrary. I've explained the basis for that position, and I've even offered to provide you a corporate officer's certificate demonstrating as much. I've done my part to outline the reasons why you are proceeding in bad faith and in contravention of Rule 11. This email exchange will be our primary exhibit when we seek fees and costs associated with getting Ashley Furniture Industries, LLC – a manufacturer of furniture that does not own or operate any retail locations – dismissed from this matter.

-Bob

**Robert Amicone | Assistant General Counsel - Litigation**
Ashley Furniture Industries, LLC
**1670 E 8th Ave. | Tampa, FL 33605**
p 813.603.5553| **Ramicone@AshleyFurniture.com**
www.ashleyfurniturehomestore.com | www.ashleyfurniture.com

The information contained in this e-mail may be confidential and is intended solely for the addressee. Unauthorized access, disclosure, copying, distribution or other action taken or omitted relying on the contents of this message, is prohibited and may be unlawful. If you are not the intended recipient please reply and advise the sender of the erroneous transmission and immediately delete the message.

**From:** Spencer Sheehan <spencer@spencersheehan.com>
**Sent:** Friday, September 30, 2022 2:20 PM
**To:** Amicone, Robert <RAmicone@Ashleyfurniture.com>
**Cc:** Green, Lexie <LGreen@Ashleyfurniture.com>
**Subject:** Re: Grasty/Ashley

*** [EXTERNAL] This message comes from an external organization. Exercise caution when opening attachments or clicking links, especially from unknown senders. ***

You were not served. You were sent a waiver. There is a difference between these two things which many may not understand. A waiver that is mailed cannot qualify as service.

And while I appreciate your suggestions about the appropriate party, it's my belief that the main Ashley entity bears at least some liability in theory for the practices alleged notwithstanding that the store in question is independently owned.

If the local store entity will be added eventually that's fine too.

Lest you feel the need to respond with blustering I'm not interested in hearing it.

Your invitation to submit a nuisance settlement offer for beginning discussion was offensive and I have no intention at this time to do that.

On Fri, Sep 30, 2022 at 2:11 PM Amicone, Robert <RAmicone@ashleyfurniture.com> wrote:

Spencer:

I see that we were served with your complaint, but I was under the impression you would hold off on service pending potential resolution. Please help me understand your position at this point, especially given my message below that the appropriate party is a licensee, not Ashley Furniture Industries, LLC. Thanks.

-Bob

**Robert Amicone** | Assistant General Counsel - Litigation
Ashley Furniture Industries, LLC
**1670 E 8th Ave. | Tampa, FL 33605**
p 813.603.5553| **Ramicone@AshleyFurniture.com**
www.ashleyfurniturehomestore.com | www.ashleyfurniture.com

The information contained in this e-mail may be confidential and is intended solely for the addressee. Unauthorized access, disclosure, copying, distribution or other action taken or omitted relying on the contents of this message, is prohibited and may be unlawful. If you are not the intended recipient please reply and advise the sender of the erroneous transmission and immediately delete the message.

**From:** Amicone, Robert
**Sent:** Wednesday, September 14, 2022 12:18 PM
**To:** spencer@spencersheehan.com
**Subject:** Grasty/Ashley

Spencer:

This email follows our conversation just a few minutes ago. As I indicated during our call, Ashley Furniture Industries, LLC is a manufacturer of furniture. It does not operate any retail stores, or the website www.ashleyfurniture.com. Another entity, Ashley Global Retail, LLC, does operate certain enterprise stores. The location at issue in your complaint, however, is not one of those. That particular store in Tallahassee is owned and operated by a relatively small independent licensee. To the extent this lawsuit goes anywhere, it will need to proceed against that licensee, and not Ashley Global Retail or Ashley Furniture Industries. We can substantiate what I'm relaying here through an officer's affidavit, if necessary. In other words, there is no factual or legal basis to proceed against any Ashley entity.

If your client is seeking a large sum of money out of this lawsuit from Ashley, that will not happen. However, we are willing to entertain a nominal settlement to avoid further dispute. Please let me know your client's position on that issue. I appreciate your time today.

-Bob

**Robert Amicone** | Assistant General Counsel - Litigation
Ashley Furniture Industries, LLC
**1670 E 8th Ave. | Tampa, FL 33605**
p 813.603.5553| **Ramicone@AshleyFurniture.com**

www.ashleyfurniturehomestore.com | www.ashleyfurniture.comThe information contained in this e-mail may be confidential and is intended solely for the addressee. Unauthorized access, disclosure, copying, distribution or other action taken or omitted relying on the contents of this message, is prohibited and may be unlawful. If you are not the intended recipient please reply and advise the sender of the erroneous transmission and immediately delete the message.

--

Spencer Sheehan
Sheehan & Associates, P.C.
<u>60 Cuttermill Rd Ste 412</u>
<u>Great Neck, NY 11021</u>

Tel. (516) 268-7080
Fax (516) 234-7800
Mobile (516) 236-6456

Sent from Gmail Mobile on iPhone

--
Spencer Sheehan
Sheehan & Associates, P.C.
60 Cuttermill Rd Ste 412
Great Neck, NY 11021

Tel. (516) 268-7080
Fax (516) 234-7800
Mobile (516) 236-6456

Sent from Gmail Mobile on iPhone

| | |
|---|---|
| **From:** | Barnidge, Edward |
| **To:** | "Mitchell Domovsky" |
| **Cc:** | "Spencer Sheehan"; "Ginger Boyd" |
| **Subject:** | RE: Grasty v. Ashley |

Thank you.

**Ed Barnidge**
**Williams & Connolly LLP**
680 Maine Avenue SW, Washington, DC 20024
(P) 202-434-5340 | (F) 202-434-5029
ebarnidge@wc.com | www.wc.com/ebarnidge
*He, Him, His*

**From:** Mitchell Domovsky <mdomovsky@spencersheehan.com>
**Sent:** Tuesday, December 20, 2022 2:49 PM
**To:** Barnidge, Edward <EBarnidge@wc.com>
**Cc:** Spencer Sheehan <spencer@spencersheehan.com>; Ginger Boyd <Ginger.Boyd@nelsonmullins.com>
**Subject:** Re: Grasty v. Ashley

Dear Counsel,

Please see attached notice of dismissal.

Thank you,

Mitchell Domovsky
Paralegal
Sheehan & Associates, P.C.
60 Cuttermill Rd Ste 412
Great Neck, NY 11021
Tel: (516) 268-7080
Fax: (516) 234-7800
mdomovsky@spencersheehan.com

Notice To Recipient: This e-mail is meant for only the intended recipients, and may be a communication that is confidential, private and privileged by law. If you are not an intended recipient, or if any part of the content or title of this email shows that you received this e-mail in error, any continued review by you of the email, or use, dissemination, distribution, or copying of this e-mail, is strictly prohibited. Please notify us immediately of any error in sending this email by return e-mail, and please delete this message and all copies from your system. Thank you for your cooperation.

On Tue, Dec 20, 2022 at 2:43 PM Barnidge, Edward <EBarnidge@wc.com> wrote:

Spencer:  I am traveling out of the country for the holidays beginning tomorrow and will be difficult to reach.  I want it to be clear for the Court that Ashley is being dismissed.  How do you intend to make that the case—again, I would urge you to file a notice of dismissal as to Ashley.  Thank you

Ed

**Ed Barnidge**
**Williams & Connolly LLP**
680 Maine Avenue SW, Washington, DC 20024
(P) 202-434-5340 | (F) 202-434-5029
ebarnidge@wc.com | www.wc.com/ebarnidge
*He, Him, His*

**From:** Barnidge, Edward <EBarnidge@wc.com>
**Sent:** Monday, December 19, 2022 8:52 PM
**To:** Spencer Sheehan <spencer@spencersheehan.com>; Kinga Fenikowska <kfenikowska@spencersheehan.com>; Mitchell Domovsky <mdomovsky@spencersheehan.com>
**Cc:** Ginger Boyd <Ginger.Boyd@nelsonmullins.com>
**Subject:** RE: Grasty v. Ashley

Spencer:  I am glad you have reached that proper conclusion as to my client and certainly wish you had done so awhile ago.  My client certainly should not have to do any more work on this matter in light of your conclusion that you do not intend to proceed against them.  I was just now making substantial edits to the Joint Rule 26(f) Report for example, but that report is moot now.  I submit that you should file a notice of dismissal as to my client tomorrow in light of Thursday's deadline on the 26(f) Report.

Ed

**From:** Spencer Sheehan <spencer@spencersheehan.com>
**Date:** Monday, Dec 19, 2022 at 8:35 PM
**To:** Barnidge, Edward <EBarnidge@wc.com>, Kinga Fenikowska <kfenikowska@spencersheehan.com>, Mitchell Domovsky <mdomovsky@spencersheehan.com>
**Cc:** Ginger Boyd <Ginger.Boyd@nelsonmullins.com>
**Subject:** Re: Grasty v. Ashley

I looked into it I have done independent research into the company and nature of the relationships with the local stores. Not based on your TUA.

My intention is not presently to proceed against the current defendant. However I would like to have a bit more time to determine if amendment to add the insurance provider is the right option here.

My initial thought is that it's cleaner to file a new case against the insurer instead of adding and

swapping out parties.

But given that we have until Thursday that may be sufficient.

On Mon, Dec 19, 2022 at 4:43 PM Spencer Sheehan <spencer@spencersheehan.com> wrote:

Ok

On Mon, Dec 19, 2022 at 4:40 PM Barnidge, Edward <EBarnidge@wc.com> wrote:

Spencer:  Good afternoon.  I believe our Joint Rule 26(f) Report is due on Thursday.  I will send you my comments by tomorrow morning.  As an accommodation, we will hold our planned motion to dismiss until Thursday as well to give you additional time to consider the Trademark Usage Agreement I sent you.  We hope you will decide upon review that the proper course here is to dismiss the Ashley defendant.    Ed

**Ed Barnidge**
**Williams & Connolly LLP**
680 Maine Avenue SW, Washington, DC 20024
(P) 202-434-5340 | (F) 202-434-5029
ebarnidge@wc.com | www.wc.com/ebarnidge
*He, Him, His*

**From:** Spencer Sheehan <spencer@spencersheehan.com>
**Sent:** Wednesday, December 14, 2022 9:21 AM
**To:** Barnidge, Edward <EBarnidge@wc.com>
**Cc:** Ginger Boyd <Ginger.Boyd@nelsonmullins.com>
**Subject:** Re: Grasty v. Ashley

Will need more time than Friday not sure how much

On Wed, Dec 14, 2022 at 8:48 AM Barnidge, Edward <EBarnidge@wc.com> wrote:

Spencer:  Further on my email on timing, if you told me that you do intend to consider my email and documentation you  had asked me to send but need a bit more time, then I'm all ears.  But if you already have made your decision to press forward, then I'd appreciate knowing that too.

Ed

**Ed Barnidge**
**Williams & Connolly LLP**
680 Maine Avenue SW, Washington, DC 20024
(P) 202-434-5340 | (F) 202-434-5029
ebarnidge@wc.com | www.wc.com/ebarnidge
*He, Him, His*

**From:** Barnidge, Edward <EBarnidge@wc.com>
**Sent:** Tuesday, December 13, 2022 10:47 PM
**To:** Spencer Sheehan <spencer@spencersheehan.com>
**Cc:** Ginger Boyd <Ginger.Boyd@nelsonmullins.com>

**Subject:** RE: Grasty v. Ashley

Spencer

How much time are you wanting to respond?

Ed

**From:** Spencer Sheehan <spencer@spencersheehan.com>
**Date:** Tuesday, Dec 13, 2022 at 10:43 PM
**To:** Barnidge, Edward <EBarnidge@wc.com>
**Cc:** Ginger Boyd <Ginger.Boyd@nelsonmullins.com>
**Subject:** Re: Grasty v. Ashley

I'm not obligated to respond on your set schedule you can file your motion to dismiss whenever you feel like

On Tue, Dec 13, 2022 at 8:35 PM Barnidge, Edward <EBarnidge@wc.com> wrote:

Spencer:

It was good to speak with you on Thursday. As I mentioned in detailing the bases for our forthcoming motion to dismiss, the Complaint is premised on a fiction. Ashley Furniture Industries, LLC ("Ashley") had no role in selling the Guardian protection plan at issue or in Guardian's administration of claims thereunder. As background, Ashley manufactures home furniture, which it wholesales to a wide variety of retail outlets, including brick-and-mortar "Ashley HomeStores." Many Ashley HomeStores are "independently licensed and operated." Compl. ¶ 57. Here's how that works: one of Ashley's affiliates, Ashley HomeStores, Ltd. (collectively with Ashley, "the Ashley Parties"), licenses use of the "Ashley" tradename to these independent entities. The Tallahassee store here is an example of that.

You claimed you wanted to see documentation of the Tallahassee store's independence, so please find attached the Trademark Usage Agreement ("TUA") in effect at the time of Ms. Grasty's transaction identifying the licensee as Turner Furniture of Tallahassee A, LLC and the owner as S. Russell Turner, Jr. The TUA specifies that the Licensee is an independent contractor; is not an agent of the Ashley Parties; and must identify itself as an "Independently Owned and Operated Licensed Business." ¶ 35 It must operate the store in accordance with all laws. ¶ 13. The Complaint claims the store sales representative made certain promises to Ms. Grasty. The TUA addresses that very scenario by specifying that the Ashley Parties bear **no liability or obligation** "that arises directly or indirectly from additional promises, representations, or warranties made by Licensee or any employee or agent of Licensee, that extend, enhance, or modify any warranty given by [Ashley] for Ashley Products." ¶ 21. Consistent with this allocation of

responsibility, the Licensee indemnifies the Ashley parties against any claims arising from any such additional promises, representations, or warranties.  *Id.*

Thank you for agreeing on our call to maintain the TUA as confidential.  I trust you will agree upon review of it that the Ashley Parties are not responsible for any promises, including any service contracts, made or offered by the store. Note further: no requirement is imposed by the Ashley Parties regarding the requirements or identity of the furniture protection provider that a store offers, if any.

In light of the above, please confirm that you will dismiss Ashley from the pending class action complaint.  If we do not receive confirmation from you by Friday, we intend to file our motion to dismiss.  It should never come to that.

Ed


**Ed Barnidge**
**Williams & Connolly LLP**
680 Maine Avenue SW, Washington, DC 20024
(P) 202-434-5340 | (F) 202-434-5029
ebarnidge@wc.com | www.wc.com/ebarnidge
*He, Him, His*

---

This message and any attachments are intended only for the addressee and may contain information that is privileged and confidential. If you have received this message in error, please do not read, use, copy, distribute, or disclose the contents of the message and any attachments. Instead, please delete the message and any attachments and notify the sender immediately. Thank you.

--
Spencer Sheehan
Sheehan & Associates, P.C.
60 Cuttermill Rd Ste 412
Great Neck, NY 11021

Tel. (516) 268-7080
Fax (516) 234-7800
Mobile (516) 236-6456

Sent from Gmail Mobile on iPhone

--
Spencer Sheehan
Sheehan & Associates, P.C.
60 Cuttermill Rd Ste 412
Great Neck, NY 11021

Tel. (516) 268-7080
Fax (516) 234-7800
Mobile (516) 236-6456

Sent from Gmail Mobile on iPhone

--

Spencer Sheehan
Sheehan & Associates, P.C.
60 Cuttermill Rd Ste 412
Great Neck, NY 11021

Tel. (516) 268-7080
Fax (516) 234-7800
Mobile (516) 236-6456

Sent from Gmail Mobile on iPhone

--

Spencer Sheehan
Sheehan & Associates, P.C.
60 Cuttermill Rd Ste 412
Great Neck, NY 11021

Tel. (516) 268-7080
Fax (516) 234-7800
Mobile (516) 236-6456

Sent from Gmail Mobile on iPhone

Exhibit B

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

| | |
|---|---|
| Katie Grasty, individually and on behalf of all others similarly situated,<br><br>                               Plaintiff,<br><br>                   - against -<br><br>Ashley Furniture Industries, LLC,<br><br>                               Defendant | 4:22-cv-00334<br><br><br>Class Action Complaint<br><br>Jury Trial Demanded |

    Plaintiff alleges upon information and belief, except for allegations about Plaintiff, which are based on personal knowledge:

    1.    Ashley Furniture Industries, LLC ("Defendant") markets, administers and sells extended furniture protection plans described as "service contracts" in connection with its sale of furniture ("Service").[1]

    2.    Fla. Stat. § 634.401(13) defines a service warranty as

> [A]ny warranty, guaranty, extended warranty or extended guaranty, maintenance service contract equal to or greater than 1 year in length or which does not meet the exemption in paragraph (a), contract agreement, or other written promise for a specific duration to perform the repair, replacement, or maintenance of a consumer Service, or for indemnification for repair, replacement, or maintenance, for operational or structural failure due to a defect in materials or workmanship, normal wear and tear, power surge, or accidental damage from handling in return for the payment of a segregated charge by the consumer [.]

**I.    PLAINTIFF'S PURCHASE OF THE SERVICE**

    3.    In October 2019, Plaintiff bought the Savesto Charcoal Sofa with a service contract from Defendant's store at 1190 Capital Cir SE, Tallahassee, FL 32301.

---

[1] Florida refers to service contracts as service warranties.



4.     The total cost with delivery was over $2,300.

5.     During the sales process, Defendant's representatives encouraged Plaintiff to purchase the Service by informing her it would cover any sort of damage, including damage caused by a dog ripping it, and was a prudent investment for her costly purchase.

6.     Since Plaintiff's family includes a spouse, three kids, and three dogs, she was persuaded by the representative to purchase the Service given that it could provide protection and gave her peace of mind on her expensive purchase.

7.     Plaintiff was not able to review the terms of the Service before her purchase.

8.     After Plaintiff purchased the Service, she received a "No Use/No Lose Certificate" which told her that "If you don't use it, you won't lose it!"

9.     The Certificate confirmed she made a responsible decision to purchase the Service, stating, "Congratulations on making the smart decision to protect your new furniture! We want you to be able to enjoy the beauty of your new purchase for years to come without worrying about the types or accidental stains and damages that are covered by your Guardian protection plan."

10.    Plaintiff received the full service agreement electronically only after she purchased the Service.

11.    Upon information and belief, the electronic transmission of the service agreement did not notify Plaintiff of her right to receive the contract via United States mail rather than electronic transmission, in violation of Fla. Stat. § 634.414(4).

12.    The service agreement stated that "The Plan covers materials and labor costs to service your furniture item(s) in the event a furniture item becomes accidentally damaged during normal residential use due to stains or other covered damage or defects as more specifically described in the Service Specific Coverage section of this Plan."

13.    For fabric and leather/vinyl upholstered furniture, the terms stated, "Accidental breakage of frames, springs, and sleeper, reclining, inclining, heating, and vibrating mechanisms will be covered after the manufacturer's warranty has expired."

14.    After approximately two years of normal use, the base of the sofa collapsed in one spot, shortly followed by a collapse in a different location.



15.   In October 2021, Plaintiff submitted a claim for coverage to Defendant's third-party provider, Guardian, who operates under Defendant's instructions.

16.   Several weeks later, Plaintiff was denied coverage, as indicated below:

> The damage you have reported is not eligible for coverage under your protection plan.
>
> The plan you purchased from the retailer shown above does cover your furniture for:
>
> • breakage of frames, springs, and sleeper, reclining, inclining, heating, and vibrating mechanisms will be covered after the manufacturer's warranty has expired.
>
> However, the damages listed below are not coverages of your plan:
>
> • excessive damage, misuse, neglect, mishandling, and abuse.
>
> *Please see attached copy of your plan for details*
>
> Please understand that this is a final determination and your claim cannot be changed or altered.
>
> If desired, you may have these stain(s)/damage(s) serviced by a licensed technician at your own expense.
>
> If you do have these stain(s)/damage(s) serviced, please retain a copy of the receipt.
>
> This receipt will be required to file a claim in this same location(s) in the future.

17.   No way was offered to appeal the determination of the claim.

## II.   VIOLATIONS OF SERVICE WARRANTY ASSOCIATIONS LAW

18.   Defendant misrepresented and falsely advertised the benefits, advantages, conditions, or terms of the Service by describing it as a "Premium Protection Plan," stating that, "Life Happens and So Do Accidents" on its website, which constitutes violations of Fla Stat. § 634.436(1)-(2).

Furniture Protection



19.     Defendant engaged in unfair claim settlement practices by making material misrepresentations to Plaintiff for the purpose of denying her claims, which were less favorable terms than those provided for by the agreement. Fla Stat. § 634.436(5)(b).

20.     Specifically, Defendant cited "excessive damage, misuse, neglect, mishandling, and abuse" when it knew this was false, because Plaintiff indicated the breakage was caused by "normal use" during "normal sitting" on the sofa.

21.     The only exclusion that lists misuse and neglect is #22, which excludes:

> Repairs necessitated by intentional physical damage, acts of nature, fire, burglary, theft, vandalism, collision, spilled liquids (unless resulting in a covered stain or liquid ring), corrosion, insect infestation, misuse, neglect, mishandling and abuse.

22.     Defendant had no basis to classify the breakage as being caused by any activity identified in this provision.

23.     Defendant denies claims based on "excessive damage, misuse, neglect, mishandling, and abuse" with such frequency as to indicate its general business practice is to fail to adequately investigate claims. Fla Stat. § 634.436(5)(c).

24.     Defendant's representatives receive incentives for each customer who signs up for the Service, and are incentivized to "over-promise" its benefits and not inform customers of its numerous limitations.

5

25.    Defendant did not ask Plaintiff further questions about the "excessive damage" it determined disqualified her from coverage.

26.    Defendant failed to provide a reasonable explanation to Plaintiff of the contractual basis for her denial in relation to her specific facts.

27.    Defendant failed to invite further inquiry from Plaintiff for the basis of her denial, stating that "Please understand that this is a final determination and your claim cannot be changed or altered."

28.    Thousands of persons in Florida and the States covered by the proposed classes are issued the same boilerplate denials, untethered to their specific facts.

29.    That Defendant fails to adequately investigate or consider claims is evinced by its form rejection letter it sends to customers like Plaintiff.

30.    These letters erroneously state that they are being sent on behalf of Bob's Discount Furniture, instead of Ashley.

31.    This failure to modify the retailer in the form rejection letters is indicative of the lack of care and diligence applied in investigating claims.

## III.   UNLAWFUL INSURANCE POLICY

32.    The Service sold by Defendant is an unlawful insurance policy, which is prohibited by Fla. Stat. § 634.428.

33.    An example of a service contract is where an automobile manufacturer agrees to repair or replace car parts should they fail or break down within a specified period, i.e., 5 years or 50,000 miles.

34.    However, Defendant sells the Service as protection against "accidents," or fortuitous events that happen by chance, rather than by design, such as repair of car parts within 5 years.

6

35.   For instance, an insured cannot reasonably expect that all losses, however caused, would be reimbursed, because this would grant a windfall to the insured.

36.   An insurer cannot confine causation to the point where recovery would be impossible, thereby affording a windfall in the other direction.

37.   Equity is achieved by requiring that the loss be accidental or fortuitous – out of the reasonable control and expectation of both the insurer and insured.

38.   The requirement of fortuity ensures that the scope of coverage provided is consistent with the reasonable expectations of the contracting parties.

39.   The policy behind insurance regulation is to protect the public from surrendering its money for questionable or worthless "insurance," like the Service

40.   Service contracts such as the Service sold by Defendant are subject to abuse because they sell insurance yet are not subject to the extensive regulations and capital reserve requirements of insurance companies.

41.   Providers of service contracts pay no more than between four and fifteen cents per dollar to cover claims, with the rest profit.

42.   Defendant misuses the terms of the Service to insure a certainty by denying claims like Plaintiff's, in bad faith and restricting the criteria to recover under the policy, which is fraud.

43.   Defendant has not reasonably defined what types of damage qualifies as excessive, misuse or neglect, which results in denial of valid claims.

44.   Defendant failed to meet its burden that Plaintiff's claims were not covered by the Service, because the terms in the agreement are not defined or otherwise allow it to deny coverage to all or substantially all claims.

## IV.   CONCLUSION

45.    The Service contains other defects, representations and/or omissions which render it unlawful and deceptive.

46.    As a result of the false and misleading representations, the Service is sold at a premium price, approximately no less than $229, excluding tax and sales, higher than similar services represented in a non-misleading way, and higher than it would be sold for absent the misleading representations and omissions.

<u>Jurisdiction and Venue</u>

47.    Jurisdiction is based on the Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2).

48.    The aggregate amount in controversy exceeds $5 million, including any statutory or punitive damages, exclusive of interest and costs.

49.    Plaintiff Katie Grasty is a citizen of Tallahassee, Florida, Leon County.

50.    Defendant Ashley Furniture Industries, LLC is a Wisconsin limited liability company with a principal place of business in Arcadia, Wisconsin, Trempealeau County.

51.    The sole member of Defendant is Ashley Holdings, Inc., a Wisconsin corporation with a principal place of business in Arcadia, Wisconsin, Trempealeau County.

52.    The class of persons Plaintiff seeks to represent includes persons who are citizens of different states from which Defendant is a citizen.

53.    The members of the proposed classes Plaintiff seeks to represent are more than 100, because the Service is sold at hundreds of Ashley locations in the States of the proposed classes.

54.    ·Venue is in this District, and the action should be assigned to the Tallahassee Division, because a substantial part of the events or omissions giving rise to the claims occurred in Leon County, including Plaintiff's purchase and use of the Service, exposure to and reliance on

8

the representations, and her awareness that they were misleading.

<u>Parties</u>

55.    Plaintiff Katie Grasty is a citizen of Tallahassee, Florida, Leon County.

56.    Defendant Ashley Furniture Industries, LLC is a Wisconsin limited liability company with a principal place of business in Arcadia, Wisconsin, Trempealeau County.

57.    Defendant operates the Ashley furniture stores chain, consisting of corporate and independently licensed and operated furniture stores.

58.    The non-corporate stores are subject to policies and practices of Defendant, like any franchisee.

59.    Defendant is the world's largest home furniture manufacturer and the leading furniture store in the United States based on sales.

60.    Plaintiff believed and expected the Service would provide protection of her purchase from accidental damage through repair, replacement, or maintenance, with assurances by sales representatives and the terms.

61.    Plaintiff purchased the Service and a Savesto Charcoal Sofa and adjoining chairs at Ashley Furniture, 1190 Capital Cir SE, Tallahassee, FL 32301, in October 2019.

62.    Plaintiff paid more for the Service than she would have paid had she known the representations were false and misleading, as she would not have bought it or paid less.

63.    Plaintiff would consider purchasing the Service again on different terms, such as if it provided what it promised and/or at a lower price.

64.    Plaintiff is unable to rely on the representations not only of this Service, but other similar services, because she is unsure whether those representations are truthful.

## Class Allegations

65.   Plaintiff seeks certification under Fed. R. Civ. P. 23 of the following classes:

> **Florida Class:** All persons in the State of Florida and who purchased the Service during the statutes of limitations for each cause of action alleged; and
>
> **Consumer Fraud Multi-State Class:** All persons in the States of Alabama, Montana, Alaska, Texas, Arizona, New Mexico, Mississippi, Utah, Nebraska, South Carolina, Tennessee, and Virginia who purchased the Service during the statutes of limitations for each cause of action alleged.

66.   Common questions of issues, law, and fact predominate and include whether Defendant's representations were and are misleading and if Plaintiff and class members are entitled to damages.

67.   Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair, misleading, and deceptive representations, omissions, and actions.

68.   Plaintiff is an adequate representative because her interests do not conflict with other members.

69.   No individual inquiry is necessary since the focus is only on Defendant's practices and the class is definable and ascertainable.

70.   Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

71.   Plaintiff's counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

72.   Plaintiff seeks class-wide injunctive relief because the practices continue.

> **Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"),**
> **Fla. Stat. § 501.201 *et seq.***

73.   Plaintiff incorporates by reference all preceding paragraphs.

74.   Defendant violated the above-identified provisions of this State's laws for warranty associations.

75.   Plaintiff and class members were damaged by paying more for the Service than they would have paid had they known it was essentially worthless.

Violation of State Consumer Fraud Acts
(Consumer Fraud Multi-State Class)

76.   The Consumer Fraud Acts of the States in the Consumer Fraud Multi-State Class are similar to the consumer protection statute invoked by Plaintiff and prohibit the use of unfair or deceptive business practices in the conduct of commerce.

77.   The members of the Consumer Fraud Multi-State Class were harmed in the same manner as Plaintiff, and reserve their rights to assert their consumer protection claims under the Consumer Fraud Acts of the States they represent and/or the consumer protection statutes invoked by Plaintiff.

Bad Faith Insurance Denial

78.   Insurance is defined as a contract whereby one undertakes to indemnify another against loss, damage, or liability arising from a contingent or unknown event.

79.   The Service purported to cover damages caused by accidents, or fortuitous events, which constitutes insurance.

80.   By purchasing the Service, Plaintiff was protecting her purchase against future accidents.

81.   Defendant breached the implied covenant of good faith and fair dealing by withholding benefits under the Service without cause.

82.   This is because it had no basis to claim the damage was excessive or from misuse or

11

neglect.

83.    The records of Defendant and its agents advise its adjustors to deny claims based on excessive damage and customer misuse and neglect even where it lacks evidence of these causes.

84.    In so doing, Defendant frustrated the purpose of the Service, to the detriment of Plaintiff.

85.    The adjustors at Guardian, working at Defendant's direction, upon information and belief, are incentivized to deny claims by policies of management and are provided detailed instructions about how to deny legitimate claims.

Breaches of Express Warranty,<br>Implied Warranty of Merchantability/Fitness for a Particular Purpose and<br>Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, <i>et seq.</i>

86.    The Service was designed, manufactured, identified, marketed, and sold by Defendant and expressly and impliedly warranted to Plaintiff that it was not defective, and would provide coverage for the events indicated.

87.    The Service was sold to insure Plaintiff's furniture against damage and loss and expressly and impliedly warranted that it would cover accidental damage through repair, replacement, or maintenance, with assurances by sales representatives it would cover virtually anything that happened to the covered items.

88.    Defendant directly marketed the Service to Plaintiff and consumers through its advertisements and marketing, in-store representatives, various forms of media, on the hang tags of the furniture, store displays, in print circulars, direct mail, and targeted digital advertising.

89.    Defendant knew the attributes that potential customers like Plaintiff were seeking, such as insurance to protect against accidents, and developed its marketing to directly meet those needs and desires.

90.    Defendant's representations were conveyed in writing and promised the Service

12

would be defect-free, and Plaintiff understood this meant that it would provide protection of one's purchases from accidental damage through repair, replacement, or maintenance, with assurances by sales representatives that it would cover virtually anything that went wrong with the covered items.

91.   Defendant affirmed and promised that the Service would provide protection of one's purchases from accidental damage through repair, replacement, or maintenance.

92.   Defendant described the Service so Plaintiff and consumers believed it would provide protection of one's purchases from accidental damage through repair, replacement, or maintenance, which became part of the basis of the bargain that it would conform to its affirmations and promises.

93.   Defendant had a duty to disclose and/or provide non-deceptive descriptions and marketing of the Service.

94.   This duty is based on Defendant's outsized role in the market for this type of Service, custodian of the Ashley brand, the largest seller of furniture in the nation.

95.   Plaintiff recently became aware of Defendant's breach of the Service's warranties.

96.   Plaintiff provides or will provide notice to Defendant, its agents, representatives, retailers, and their employees that it breached the Service's express, implied and Magnusson Moss warranties.

97.   Defendant received notice and should have been aware of these issues due to complaints by third-parties, including regulators, competitors, and consumers, to its main offices, and by consumers through Service reviews and online forums.

98.   The Service did not conform to its affirmations of fact and promises.

99.   The Service was not merchantable because it was not fit to pass in the trade as

13

advertised, not fit for the ordinary purpose for which it was intended and did not conform to the promises or affirmations of fact made on the packaging, container, or label, because it was marketed as if it would provide protection of one's purchases from accidental damage through repair, replacement, or maintenance.

100. The Service was not merchantable because Defendant had reason to know the particular purpose for which the Service was bought by Plaintiff, because she expected it would provide protection of one's purchase from accidental damage through repair, replacement, or maintenance, with assurances by sales representatives that it would cover virtually anything that went wrong with the covered items, and she relied on Defendant's skill and judgment to select or furnish such a suitable service.

<u>Negligent Misrepresentation</u>

101. Defendant had a duty to truthfully represent the Service, which it breached.

102. This duty is based on its position, holding itself out as having special knowledge and experience in this area, custodian of the Ashley brand.

103. The representations took advantage of consumers' cognitive shortcuts at the conclusion of the furniture purchasing process and trust in Ashley, a globally recognized brand.

104. Plaintiff reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, her purchase of the Service.

<u>Fraud</u>

105. Defendant misrepresented and omitted that the Service would provide protection of one's purchase from accidental damage through repair, replacement, or maintenance.

106. Defendant's representatives receive incentives for each customer who signs up for the Service, and are incentivized to "over-promise" its benefits and not inform customers of its

14

numerous limitations.

Unjust Enrichment

107.  Defendant obtained benefits and monies because the Service was not as represented and expected, to the detriment and impoverishment of Plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

Jury Demand and Prayer for Relief

Plaintiff demands a jury trial on all issues.

**WHEREFORE,** Plaintiff prays for judgment:

1. Declaring this a proper class action, certifying Plaintiff as representative and the undersigned as counsel for the Class;

2. Entering preliminary and permanent injunctive relief by directing Defendant to correct the challenged practices to comply with the law;

3. Awarding monetary, statutory, and/or punitive damages pursuant to applicable laws;

4. Awarding costs and expenses, including reasonable fees for Plaintiff's attorneys and experts; and

5. Other and further relief as the Court deems just and proper.

Dated:   September 13, 2022

Respectfully submitted,

/s/Spencer Sheehan
Sheehan & Associates, P.C.
60 Cuttermill Rd Ste 412
Great Neck NY 11021
(516) 268-7080
spencer@spencersheehan.com

NEOPOST                    FIRST-CLASS MAIL

 US POSTAGE  $000.57⁰

ZIP 85255
041M11464476

Spencer Sheehan
Spencer Sheehan
60 Cuttermill Road
Great Neck NY 11021

6845265-1

PRESORTED
FIRST-CLASS MAIL
U.S. POSTAGE
PAID
LETTERSTREAM



960549831    23   HBD6NF4   53717

Exhibit C

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

| | |
|---|---|
| Katie Grasty, individually and on behalf of all others similarly situated, | 4:22-cv-00334-MW-MAF |
| Plaintiff, | Hon. Mark E. Walker |
| - against - | |
| Ashley Furniture Industries, LLC, | |
| Defendant | |

**NOTICE OF VOLUNTARY DISMISSAL**

Plaintiff gives notice that this action is voluntarily dismissed. Fed. R. Civ. P. 41(a)(1)(A)(i).

Dated:    December 20, 2022

Respectfully submitted,

Sheehan & Associates, P.C.
/s/Spencer Sheehan
Spencer Sheehan
spencer@spencersheehan.com
60 Cuttermill Rd Ste 412
Great Neck NY 11021
Tel: (516) 268-7080



GRASTY, KATIE

**GUARDIAN**
PROTECTION PRODUCTS, INC.

Dear GRASTY, KATIE

We're pleased to provide you with the terms and conditions for your 5-Year P1PT-95595Guardian Residential Furniture Plan you recently purchased from Ashley Furniture Homestore CE1 ▮▮▮▮▮ Your plan was activated on 10/11/2019, will expire on 10/11/2024, and will provide up to ▮▮▮▮▮ in coverage for your new furniture.

The furniture items that are covered under this Plan are those listed on the receipt you received at the time of purchase of this Plan.

Your Plan is attached to this Welcome Letter. Please read it carefully as it provides the specific details of your coverage.

In the event a covered stain or damage occurs, please report the incident to Guardian within 30 days using the toll-free customer service number found on your Plan. While you don't need to know your Plan registration number in order to file a service request, having the following items handy will help expedite the service request process: a copy of your Plan documents, your itemized receipt, photos of the affected area(s), details on what caused the damage – including when the damage occurred.

Under the terms of your Plan, Guardian may provide professional cleaning or repair services through our nationwide network of skilled third-party technicians. Ultimately, if the covered item cannot be cleaned or repaired, we'll replace it as outlined in the Plan.

Thank you for your business. We look forward to providing you with the highest levels of service over the next 5 years.

The Guardian Customer Service Team

RESIDENTIAL FURNITURE – TERMS AND CONDITIONS

This is a legal contract (hereinafter referred to as the "Plan"). By purchasing it, you understand that it is a legal contract and acknowledge that you have had the opportunity to read the terms and conditions set forth herein. This Plan and your Welcome Letter and receipt, containing the Effective Date and Expiration Date of your Plan, and the product identification constitute the entire agreement between you and us.

NOTE: This Plan is not an insurance policy, cleaning or maintenance contract, or your original manufacturer warranty. This Plan covers defects in workmanship and/or material of your covered furniture item(s) and, if applicable, accidental damage from normal household use, as described herein.

**DEFINITIONS:**
Throughout this Plan the words (1) "you" and "your" refer to the purchaser of this Plan as shown on the receipt, and includes the Lessee if the product was acquired under a rent-to-own or lease-purchase transaction (collectively, "RTO Transaction"); (2) "we", "us", "our" refer to the company obligated under this Plan as referenced in the Obligor section of this Plan; (3) "Administrator" refers to the entity that is responsible for the administration of the Plan as referenced in the Administrator section of this Plan; (4) "furniture item(s)" refers to indoor or outdoor furniture constructed of upholstered fabric, leather/vinyl or wood/hard surfaces; adjustable bases; and area rugs that you purchased concurrently with this Plan and are shown as covered furniture item(s) on the Welcome Letter or receipt; (5) "retailer" indicates the dealer, store or outlet where you purchased the furniture item(s) and this Plan.

**OBLIGOR:**
The Obligor of this Plan is as follows: (1) CNA Warranty Services, Inc. in all states except Florida and Washington; (2) In Florida, CNA Warranty Services of Florida, Inc.; and (3) In Washington, Continental Service Plan, Inc.

**ADMINISTRATOR:**
The Administrator of this Plan is Guardian Protection Products, Inc., ("Guardian") P.O. Box 300, Hickory, NC 28603-0300, 1-800-527-8485.

**TERM:**
Coverage under the Plan for each furniture item begins with the later of the Plan Effective Date, the purchase date of the furniture item, or the date the furniture item was delivered to you, and lasts for the Term stated on the Welcome Letter or receipt. This Plan is not renewable.

**RTO TRANSACTIONS**
Where a furniture item was initially acquired under RTO Transaction, any cash settlement or refund will be paid to the owner of the furniture item at the time the settlement is made. This will be the lessor ("Lessor") if you have not yet acquired ownership of the property. In all other respects, the lessee ("Lessee") will retain a beneficial interest in this Plan and all non-cash benefits described herein shall be rendered to the Lessee. Any owner obligations related to maintenance of the furniture item shall be the responsibility of the Lessee during the term of any RTO Transaction except as provided by law. Any reference to purchased, sold, or similar terms shall include rented and leased and their derivatives. Any reference to purchaser shall mean the Lessee under the RTO Transaction and not the Lessor.

**COVERAGE:**

- This Plan is limited to the 50 states of the United States, including the District of Columbia, and is only valid for new furniture item(s) purchased concurrently with this Plan and shown on the Welcome Letter or receipt. The Plan covers materials and labor costs to service your furniture item(s) in the event a furniture item becomes accidentally damaged during normal residential use due to stains or other covered damage or defects as more specifically described in the Product Specific Coverage section of this Plan.
- All coverages are for covered occurrences from a single incident.
- The furniture item(s) must be picked up, delivered, and installed stain, damage and soil-free from the authorized retailer.
- The warranty will be registered electronically by your retailer within 30 days of the furniture item's purchase date or delivery date if your furniture item was delivered.
- Furniture item(s) and materials replaced under the terms and conditions of this Plan become the sole property of the Obligor except where prohibited by law.
- The Plan is non-transferrable to another owner; however, in the case of an RTO Transaction, this Plan will automatically be transferred from the Lessor to the Lessee upon Lessee's fulfillment of all terms of the RTO Transaction, and such Lessee shall become the outright owner of this Plan. If the furniture item and the Plan purchase are being given as gift, contact Guardian Customer Service at 1-800-527-8485 30 days from the date of purchase with the name and address of the recipient.

- You are not required to purchase this Plan as a condition of a loan or sale of any property.

NOTE: You must keep the receipt for this Plan; it is an integral part of this Plan and you will be required to reference it to obtain service. This Plan, including the terms, conditions, limitations, exceptions and exclusions, the receipt containing the length and type of Plan, commencement date and product identification constitute the entire agreement.

**PRODUCT SPECIFIC COVERAGE:**

The following are covered, subject to the Exclusions To Coverage and other Plan conditions:

1. FABRIC AND LEATHER/VINYL UPHOLSTERED FURNITURE:
   a. All accidental stains.
   b. Accidental rips, cuts, punctures or burns from a specific incident.
   c. Accidental breakage of frames, springs, and sleeper, reclining, inclining, heating, and vibrating mechanisms will be covered after the manufacturer's warranty has expired.

2. WOOD AND HARD SURFACE FURNITURE:
   a. All accidental stains
   b. Accidental breakage of wood frame or structure or other hard surface from specific incident.
   c. Accidental gouge, heat mark or liquid ring from specific incident.
   d. Accidental chip, scratch or breakage of glass or mirrors and loss of silvering on mirrors including crowned or curved glass.

3. AREA RUGS:
   a. Accidental stains caused by any food or beverage normally consumed by humans, human or pet bodily fluids, grass, grease, ballpoint pen ink, iodine, nail polish, nail polish remover, cosmetics, lipstick, crayon, and shoe polish.
   b. Accidental stains from gum.

4. LAMPS:
   a. Accidental breakage, damage to electrical switch or cord, and stains and tears to lamp shades.

**LIABILITY:**

For any single claim, the limit of liability under this Plan is the lesser of the cost of (1) authorized service/repairs, (2) replacement of affected furniture item with a new replacement piece of equal value, excluding taxes and delivery/shipping fees and (3) the price that you paid for the furniture item.

The total liability under this Plan is the purchase price you paid for the furniture item, but not to exceed the Maximum Limit of Liability shown on the Welcome Letter or receipt. In the event that the aggregate of all authorized service/repairs exceeds the purchase price paid for the furniture item or we replace the furniture item with a new piece of equal value, we shall have satisfied all obligations owed under this Plan.

If the retailer from whom this Plan was purchased is no longer in business, in the case of a covered claim, the Plan becomes service only. If the furniture item(s) cannot be serviced, the liability will be limited to a refund of the purchase price of this Plan, less paid claims. Once a refund has been issued for any furniture item, all terms and conditions of the Plan will be fulfilled and all future claims will be void.

**SERVICE REQUEST PROCESS:**
1. **Please report all covered claims to Guardian at 1-800-527-8485 within 5 or 30 days of the accidental staining or damage occurrence (see your Welcome Letter for reporting timeframe requirement)** and Guardian Customer Service Representatives will be ready to guide you through the service process. Spanish assistance is available for your convenience. Ensure that you have your original itemized receipt and Plan documents in hand to reference the contract and Plan number, which will be required to qualify for service. Be prepared to describe the nature of any incident, including but not limited to, the location, size, and, if possible, how the incident occurred. **Failure to provide necessary information including receipt, photographs or other documentation within 30 days of request may result in a denial of coverage.**

2. Your service request must be authorized by Guardian prior to any covered service repair or replacement effort being initiated. Any unauthorized service repair or replacement will void coverage for the affected furniture items(s) under the Plan.

3. We may provide repair advice and/or products to aid in resolving your damage. Otherwise, you may receive a no charge in-home visit by a professional technician who will service your furniture item and attempt to repair the damage. If we determine, in our sole discretion, that your furniture item cannot be serviced, we may replace the affected area(s). If the affected area(s) cannot be replaced, subject to the limit of liability, you can select a new replacement piece equal in value to the original purchase price from the retailer from whom this Plan was purchased. Professional service or replacement is limited to the affected area(s) only. At our sole discretion, replacement may be effectuated in the form of issuance of a certificate for an in-store credit at the retailer where the Plan was purchased.

4. Replacement is limited to the retailer where the Plan was purchased. If you move outside of the delivery area of the retailer, you must pay all applicable shipping/delivery costs associated with the Plan service request.

5. We may offer a cash settlement in lieu of cleaning, repair or replacement should you decide to keep the original furniture item in its present condition. If a cash settlement offer is accepted by the Lessee in an RTO Transaction, the cash settlement will be paid to the Lessor/owner of the product at the time the settlement is made, as stated in the RTO Transactions section above.

6. We will not replace or otherwise service matching pieces of furniture items that are not damaged and we are not responsible for, and will take no action to correct, dye lot or texture variations arising from service or replacement of a part of a furniture item or replacement of an entire furniture item. This Plan does not transfer to replacement furniture.

You shall reasonably cooperate with us and Guardian in our efforts to perform our obligations under this Plan, which may include providing required documentation, including but not limited to sales receipts, and photographs. Failure to comply with the provisions in this Plan may result in your service request being deemed ineligible for service. We have the right to deny service should you refuse our attempts to repair or service. You also must provide a safe, non-threatening environment for our technicians to perform service. If you are not present for a scheduled technician visit, we may close your service request.

NOTE: Materials and services covered during the manufacturer's warranty period are the responsibility of the manufacturer. This Plan is inclusive of the manufacturer's warranty; it does not replace the manufacturer's warranty, but provides certain additional benefits during the term of the manufacturer's warranty.

DEDUCTIBLE: No deductible is required.

## EXCLUSIONS TO COVERAGE:

1. Anything not listed in the "Product Specific Coverage" of this Plan.

2. Damage to furniture items that is covered or should be covered by the manufacturer's warranty, repairer's warranty or any other warranty in effect; any and all pre-existing conditions that occur prior to the effective date of this Plan; defects that are subject to manufacturer's recall; any breach of an implied or expressed warranty of merchantability or fitness; any furniture item sold without a store or manufacturer warranty.

3. Damage that occurs to furniture items while located outside the 50 states of the United States, including the District of Columbia.

4. Damage caused during, or as result of delivery, handling, set-up or assembly of furniture items; furniture items in transit or storage; furniture items located outdoors or on patios or screened rooms where they may be directly or indirectly exposed to outside elements; damage by outside contractors; water damage by leaking appliances, water

heaters, skylights, pipes and all losses covered by homeowners or renters insurance.

5. Damage caused by pets or other animals, including but not limited to damage caused by beaks, claws, or jaws; repeated pet bodily fluid stains which are considered preventable occurrences.

6. General soiling, which is defined as a gradual buildup of dirt, dust, body oils, perspiration, or any other accumulated stains that cannot be attributed to a single incident.

7. Indentations from writing on wood surface or any type of surface abrasion; finish scorching (unless a specifically covered heat mark), wood burns or heat damage; loss of silvering of glass or mirror components (unless specifically covered); scratches, rips, cuts, gouges, and scuff marks of any type that do not clearly penetrate through upholstery or the clear-coat finish on wood, exposing the bare wood.

8. Leather or vinyl cracking or peeling, including

damage caused by perspiration, body and hair oils; stress tears or rips, scratches, and leather scars or finish defects. Repair and replacement are specifically excluded on split hides used in seating areas.

9. Odors.

10. Unknown stains; color loss, fading, and discoloration; all normal wear and tear, including damage that cannot be attributed to a single relatable incident.

11. Loss of foam resiliency; pilling, fraying or loosening of threads on upholstery; seam slippage or separation;.

12. Spring or coil damage (unless specifically covered)

13. Fabric or leather dye lot variations, wood finish variations or manufacturer's discontinuation.

14. Unless specifically covered, plastic or metal parts, such as hinges and drawer slides, failure of assembled joints, all other nonfunctional or aesthetic parts, including but not limited, to knobs, buttons, and rollers, and baskets or accessories used in conjunction with the covered furniture item, such as pillows, lamps, and remotes.

15. Ballpoint pen ink, crayon or lipstick marks of more than 6 inches in length are considered preventable and will not be covered.

16. Damage caused by any unauthorized cleaning products or methods; damage caused by unauthorized repair methods; defects or damage caused by topical treatments; failure to follow manufacturer recommended routine maintenance and inspection.

17. Liquid rings caused by substances such as medication (including vitamins), perspiration, body and hair oils, dyes, paints, acids, corrosives, caustic solutions, chemicals, bleaches, glue, candle wax, adhesives, gum, crayon, ink (except ballpoint pen ink), marker, dirt or other soil, pollen, tree sap, mold or mildew stains due to atmospheric causes, rust, nail polish, nail polish remover, cosmetics, hair treatments including hair gel, hair spray, mousse, or other like substances.

18. Stains caused by acids, corrosives, caustic solutions, and chemicals

19. Unless specifically covered the Plan does not apply to any other surfaces, including parachute cloth, "X" coded fabrics, 100% silk, non-colorfast material, draperies, area rugs, carpets, box springs, mattresses, nubuck, suede or other sensitive leathers,

paper, fossil stone, marble, plastic, bare wood, wooden bed slats, oil finished furniture, crowned or curved glass, and electronic components; stains or damage to box springs, carpet or flooring due to any substance that may run off of the mattress or furniture item.

20. Any upgrades to the furniture item that alter the appearance and function from the manufacturer's original state.

21. "As is", "final sale", "pre-owned" and rental products (other than an RTO Transaction); commercial use (multi-user organizations), public rental, use for profit or communal use for multi-family housing.

22. Repairs necessitated by intentional physical damage, acts of nature, fire, burglary, theft, vandalism, collision, spilled liquids (unless resulting in a covered stain or liquid ring), corrosion, insect infestation, misuse, neglect, mishandling and abuse.

23. Unauthorized modifications made to the furniture item; altered serial numbers; failure to follow manufacturer's installation, operation or maintenance instructions; repairs performed by non-authorized repairer; any items not affecting the furniture item's function.

24. Damages due to external faults, such as wiring, electrical connection or plumbing.

25. Products on loan during repair process.

26. Failure caused by voltage converter and/or applying incorrect voltage to the furniture item.

27. Diagnosis where no defect has been found or noted.

28. Damage caused by war, invasion or act of foreign enemy, hostilities, civil war, rebellion, riot, strike, labor disturbance, lockout or civil commotion.

29. Loss or injury to a person or loss or damage to property or any incidental, contingent, special or any direct or indirect loss and consequential damages including, but not limited to, losses incurred to any delay in rendering service under this Plan and loss of use during the period that your furniture item is at an authorized servicer or while awaiting materials/parts.

## GENERAL PROVISIONS:

**Cancellation:**
This Plan shall be cancelled by us for fraud or material misrepresentation, including but not limited to commercial or rental use (other than an RTO Transaction).

Unauthorized repair or replacement of a furniture item shall result in the cancellation of this Plan by us. In the event of cancellation by us, written notice of cancellation stating the effective date and reasons for the cancellation shall be mailed to you not less than sixty (60) days before cancellation is effective. This Plan can be cancelled by you at any time for any reason by mailing or delivering to us notice of cancellation at Guardian Protection Products, PO Box 300, Hickory, NC 28603-0300. If the Plan is cancelled: (a) within thirty (30) days of the receipt of this Plan, you shall receive a full refund of the price paid for the Plan, less the cost of any service or replacement received or pending, or (b) after thirty (30) days, you will receive a pro rata refund, less the cost of any service received. If you financed the purchase of this Plan, at our discretion any refund due will be paid directly to the lender of record. With respect to cancellation of this Plan by a Lessee in an RTO Transaction, such refund shall be payable to the Lessor, unless you have taken ownership of the furniture item. We will add a ten (10) percent penalty per month to a refund that is not paid or credited within forty-five (45) days after you cancel the Plan. At our discretion, the retailer may refund the portion of the Plan price due you on our behalf.

**Arbitration:**
If we cannot resolve any disputes with you related to the Plan, including claims, you and we agree to resolve those disputes through binding arbitration or small claims court instead of through courts of general jurisdiction. Further, you and we agree to waive our rights to a trial by jury and not to participate in any class arbitrations or class actions. This Plan is evidence of a transaction in interstate commerce and the Federal Arbitration Act applies to and governs the enforcement of any arbitration hereunder. The provisions of this Arbitration section shall survive the termination of this Plan. YOU AND WE UNDERSTAND AND AGREE THAT, BECAUSE OF THIS PROVISION, NEITHER YOU NOR WE WILL HAVE THE RIGHT TO GO TO COURT EXCEPT AS PROVIDED ABOVE OR TO HAVE A JURY TRIAL OR TO PARTICIPATE AS ANY MEMBER OF A CLASS OF CLAIMANTS PERTAINING TO ANY CLAIM. The arbitration shall take place before a panel of three arbitrators which shall be selected in accordance with American Arbitration Association Rule R-13. Each of the arbitrators must have at least ten years of full-time work experience or equivalent part-time experience in the commercial insurance industry in a corporate risk management department, with a commercial liability insurer, with a commercial insurance broker, as a lawyer representing insurers or insureds with respect to commercial insurance matters or as a state or federal court judge who has handled multiple cases involving commercial insurance disputes. Any award made may be enforced in any court having jurisdiction. All arbitration shall take place in Chicago, Illinois unless otherwise agreed upon.

**Insurance Securing this Plan:** This is not an insurance policy. This Plan is secured by contractual liability policies provided by: (1) Continental Casualty Company in all states except Washington and (2) The Continental Insurance Company in Washington. Both can be contacted at 151 N Franklin St., Chicago, IL 60606, 1-800-831-4262. If, within sixty (60) days, we have not paid a covered claim, provided you with a refund or you are otherwise dissatisfied, you may make a claim directly to the insurance companies. Please enclose a copy of your Plan when sending correspondence to the insurance companies.

You may contact the Obligor at 151 N Franklin St., Chicago, IL 60606, 1-866-298-3372.

**STATE SPECIFIC REQUIREMENTS:**

**The following state specific requirements are added to and become part of this Plan and supersede any other provision to the contrary:**

**Alabama Residents:** You may cancel this Plan within thirty (30) days of the receipt of this Plan. If no claim has been made under the Plan, the Plan is void and we shall refund to you the full purchase price of the Plan. Any refund due to you will be credited to any outstanding balance of your account, and the excess, if any, shall be refunded to you. A ten (10) percent penalty per month shall be added to a refund that is not paid or credited within forty-five (45) days after you cancel the Plan. If you cancel this Plan after thirty (30) days of receipt of this Plan, we shall refund to you the unearned portion of the full purchase price of the Plan. Any refund due to you will be credited to any outstanding balance of your account, and the excess, if any shall be refunded to you.

All arbitration under the Arbitration section of the Plan will take place in Alabama in the county in which you reside.

**Arizona Residents:** If your written notice of cancellation is received prior to the Plan expiration date, the Administrator shall refund the remaining pro-rata price, regardless of prior services rendered under the Plan. The pre-existing condition exclusion does not apply to conditions occurring prior to the sale of the consumer furniture item by the Obligor, its assignees, subcontractors and/or representatives.

**California Residents:** For all furniture items, the Cancellation section of the Plan is modified as follows: If the Plan is cancelled: (a) within sixty (60) days of the receipt of this Plan, you shall receive a full refund of the price paid for the Plan provided no service has been performed, or (b) after sixty (60) days, you will receive a pro rata refund, less the cost of any service received. A ten (10) percent penalty per month shall be added to any refund that is not paid or credited within thirty (30) days after you cancel the Plan.

**Connecticut Residents:** The expiration date of this Plan shall automatically be extended by the duration that the furniture item is in our custody while being repaired. In the event of a dispute with the Administrator, you may contact

The State of Connecticut, Insurance Department, PO Box 816, Hartford, CT 06142-0816, Attn: Consumer Affairs. The written complaint must contain a description of the dispute, the purchase price of the furniture item, the cost of repair of the furniture item and a copy of the Plan.

The Obligor of the Plan is CNA Warranty Services, Inc. You may contact the Obligor at 151 N Franklin St., Chicago, IL 60606, 1-866-298-3372.

You have the right to cancel the Plan if you return the furniture item or the furniture item is sold, lost, stolen or destroyed.

If, within sixty (60) days, we have not paid a covered claim, provided you with a refund or you are otherwise dissatisfied, you may make a claim directly to the insurance company, Continental Casualty Company, in writing at 151 N Franklin St., Chicago, IL 60606. Please enclose a copy of your Plan when sending correspondence to the insurance company. The written complaint must contain a description of the dispute, the purchase price of the furniture item, the cost of repair of the furniture item, and a copy of the Plan.

**Florida Residents:** In the event of cancellation by us, written notice of cancellation shall be mailed to you not less than sixty (60) days before cancellation is effective. This Plan can be cancelled by you at any time for any reason by emailing, mailing or delivering to us notice of cancellation. If the Plan is cancelled: (a) within thirty (30) days of the receipt of the Plan, you shall receive a full refund of the price paid for the Plan provided no service has been performed, or (b) after thirty (30) days, you will receive a refund based on 100% of the unearned pro rata purchase price less any claims that have been paid or less the cost of repairs made by us. If we cancel the Plan, the return purchase price is based upon 100% of the unearned pro rata purchase price. If we determine in our sole discretion that your furniture item cannot be repaired or your furniture item requires replacement instead of repair, we will replace your furniture item with an item of like kind and quality that is of comparable performance, or, reimburse you for replacement of the furniture item with a check, at our discretion, equal to the original purchase price of the furniture item, as determined by us, not to exceed the original purchase price of the furniture item, including all applicable taxes. The rate charged for this Plan is not subject to regulation by the Florida Office of Insurance Regulation.

**Georgia Residents:** This Plan shall be non-cancelable by us except for fraud, material misrepresentation, or failure to pay consideration due therefore. The cancellation shall be in writing and shall conform to the requirements of Code 33-24-44. You may cancel at any time upon demand and surrender of the Plan and we shall refund the excess of the consideration paid for the Plan above the customary short rate for the expired term of the Plan. This Plan excludes coverage for incidental and consequential damages and pre-existing conditions only to the extent such damages or

conditions are known to you or reasonably should have been known to you.

As stated in the Arbitration section of this Plan, either party may bring an individual action in small claims court. The Arbitration section does not preclude you from bringing issues to the attention of federal, state, or local agencies or entities of your dispute. Such agencies or entities may be able to seek relief on your behalf. You and we agree to waive the right to a trial by jury and to participate in class arbitrations and class actions. Nothing contained in the Arbitration section shall affect your right to file a direct claim under the terms of this Plan against Continental Casualty Company pursuant to O.C.G.A. 33-7-6.

**Illinois Residents:** You may cancel this Plan for any reason at any time. If you cancel within thirty (30) days of the Plan purchase, and we have not paid a claim, you will receive a full refund, less a cancellation fee of $50.00 or 10% of the Plan price which we may charge. If you cancel after thirty (30) days or any time after we pay a claim, you will receive a pro-rata refund of the Plan price based on the days remaining, less any claims that have been paid, less a cancellation fee of $50.00 or 10% of the Plan price which we may charge.

**Maine Residents:** You may cancel this Plan within twenty (20) days of the receipt of this Plan if sent by mail or within ten (10) days if delivered at the point of sale. If no claim has been made under the Plan, the Plan is void and we shall refund to you the full purchase price of the Plan. Any refund due to you will be credited to any outstanding balance of your account, and the excess, if any, shall be refunded to you. A ten (10) percent penalty per month shall be added to a refund that is not paid or credited within forty-five (45) days after you cancel the Plan. If you cancel this Plan after twenty (20) days of receipt of this Plan if sent by mail or after ten (10) days if delivered at the point of sale, we shall refund to you the unearned pro rata purchase price, less any claims paid. An administrative fee not to exceed ten (10) percent of the purchase price paid by you may be charged by us. Any refund due to you will be credited to any outstanding balance of your account, and the excess, if any shall be refunded to you. In the event of cancellation by us, written notice to you will be provided at least 15 days prior to the cancellation and will contain the effective date of the cancellation and the reason for cancellation. If a Plan is cancelled by us, you will be refunded 100% of the unearned pro rata purchase price paid by you, less any claims paid. An administrative fee not to exceed 10% of the purchase price paid by you may be charged by us. You are not required to purchase this Plan as a condition of a loan or a condition for the sale of any property.

**Maryland Residents:** The expiration date of the Plan is automatically extended until we have performed services under the Plan. We shall provider service under the Plan within a reasonable period of time and we will provide on your request a brief written explanation of the reasons for any delay.

**Michigan Residents:** If the performance for this Plan is interrupted because of a strike or work stoppage at the our place of business, the expiration period of the Plan shall be extended for the period of the strike or work stoppage.

**Minnesota Residents:** If you are the original purchaser of this Plan you may cancel this Plan within twenty (20) days of the receipt of this Plan if sent by mail or within ten (10) days if delivered at the point of sale. If no claim has been made under the Plan, the Plan is void and we shall refund to you or credit your account or the account of other payer of record the full purchase price of the Plan. Any refund due to you will be credited to any outstanding balance of your account, and the excess, if any, shall be refunded to you. A ten (10) percent penalty per month shall be added to a refund that is not paid or credited within forty-five (45) days after you cancel the Plan. We shall mail a written notice to you at your last known address contained in our records at least fifteen (15) days before cancellation by us. Five days' notice is required if the reason for cancellation is nonpayment of the provider fee, a material misrepresentation by you to us, or a substantial breach of duties by you relating to the covered product or its use. The notice must state the effective date of the cancellation and the reason for the cancellation. A person, such as a bank, savings association, lending institution, manufacturer, or seller of any product shall not require the purchase of a service contract as a condition of a loan or a condition for the sale of any property. Insurers issuing reimbursement insurance to providers are deemed to have received the premiums for the insurance upon the payment of provider fees by consumers for service contracts issued by the insured providers.

**Nevada Residents:** If the contract is canceled, no claims paid will be deducted from the refund to you. Fees may be deducted when you cancel the contract. If you are the original purchaser of this Plan you may cancel this Plan within twenty (20) days of the receipt of this Plan if sent by mail or within ten (10) days if delivered at the point of sale. If no claim has been made under the Plan, the Plan is void and we shall refund to you or credit your account or the account of other payer of record the full purchase price of the Plan. Any refund due to you will be credited to any outstanding balance of your account, and the excess, if any, shall be refunded to you. A ten (10) percent penalty per each thirty (30) day period shall be added to a refund that is not paid or credited within forty-five (45) days after you cancel the Plan. If we cancel this Plan, no cancellation fee will be imposed. A Plan that has been in effect for at least seventy (70) days may not be cancelled by us before the expiration of the agreed term or 1 year after the effective date of the service contract, whichever occurs first, except on any of the following grounds: (a) Failure by the holder to pay an amount when due; (b) Conviction of the holder of a crime which results in an increase in the service required under the service contract; (c) Discovery of fraud or material misrepresentation by the holder in obtaining the service contract, or in presenting a claim for service thereunder; (d) Discovery of: (1) An act or omission

by the holder; or (2) A violation by the holder of any condition of the service contract, which occurred after the effective date of the service contract and which substantially and materially increases the service required under the service contract; or (e) A material change in the nature or extent of the required service or repair which occurs after the effective date of the service contract and which causes the required service or repair to be substantially and materially increased beyond that contemplated at the time the service contract was issued or sold. No cancellation of a service contract may become effective until at least fifteen (15) days after the notice of cancellation is mailed to the holder. Arbitration doesn't apply to Nevada Residents. There is no deductible that you are required to pay under this contract. Any exclusion for damages covered by insurance or another service contract in this contract is deleted. Coverage under this Plan is excess over coverage from any insurance or service contract available to you. .

If you are not satisfied with the manner in which we are handling your claim on the Plan, you may contact the Commissioner at 1-888-872-3234.

**New Hampshire Residents:** Contact us at 1-866-298-3372 with, questions, concerns, or complaints about the Plan. In the event you do not receive satisfaction under this Plan, you may contact the State of New Hampshire Insurance Department, 21 South Fruit Street, Suite 14, Concord, New Hampshire 03301, telephone number: 1-603-271-2261. Any civil action or alternative dispute resolution procedure brought by you in connection to the Plan can be brought in New Hampshire.

**New Mexico Residents:** If you are the original purchaser of this Plan you may cancel this Plan within twenty (20) days of the receipt of this Plan if sent by mail or within ten (10) days if delivered at the point of sale. If no claim has been made under the Plan, the Plan is void and we shall refund to you or credit your account or the account of other payer of record the full purchase price of the Plan. Any refund due to you will be credited to any outstanding balance of your account, and the excess, if any, shall be refunded to you. A ten (10) percent penalty per each thirty (30) day period based on purchase price shall be added to a refund that is not paid or credited within sixty (60) days after you cancel the Plan. If this Plan has been in force for a period of seventy (70) days or more, we may not cancel it before the expiration of the Plan term or one (1) year, whichever occurs first, unless: (1) you fail to pay any amount due; (2) you are convicted of a crime which results in an increase in the service required under the Plan; (3) You engaged in fraud or material misrepresentation in obtaining this Plan; (4) you commit any act, omission, or violation of any terms of this Plan after the effective date of this Plan which substantially and materially increase the service required under this Plan; or (5) any material change in the nature or extent of the required service or repair occurs after the effective date of this Plan and causes the required service or repair to be substantially and materially increased beyond that contemplated at the time you

purchased this Plan. No cancellation will be effective until at least fifteen days after notice of cancellation is mailed to you.

Final contract price to be determined prior to presentation to consumer for signature. See NMSA 1978 Section 59A-58-10.

This service contract is insured by Continental Casualty Company. If the service contract provider fails to pay you or otherwise provide you with the covered service within 60 days of your submission of a valid claim, you may submit your claim to Continental Casualty Company at 151 N Franklin St., Chicago, IL  60606, 1-800-831-4262. If you have any concerns regarding the handling of your claim, you may contact the Office of Superintendent of Insurance at 855-427-5674.

**New York Residents:** You have the right to return the Plan within at least twenty (20) days of the date of mailing of the Plan to you or within at least ten (10) days if the Plan is delivered at the time of the purchase or within a longer time period permitted under the Plan. If no claim has been made under the Plan, the Plan shall be void and we shall refund to you the full purchase price of the Plan, plus a ten percent (10%) penalty per month shall be added to any refund that is not made to you within thirty (30) days of return of the Plan to us for cancellation. In the event of cancellation by us, written notice to you will be provided at least fifteen (15) days prior to the cancellation and will contain the effective date of the cancellation and the reason for cancellation, unless the reason for cancellation is nonpayment of the provider fee, material misrepresentation or a substantial breach of duties by you relating to the furniture item or its use.

**Oklahoma Residents:** Coverage afforded under this contract is not guaranteed by the Oklahoma Insurance Guaranty Association. In the event the Plan is canceled by you, we will return the portion of fees paid based upon ninety percent (90%) of the unearned pro rata fee less the actual cost of any service provided. In the event the contract is canceled by us, we will return the portion of fees paid based upon one hundred percent (100%) of unearned pro rata fee less the actual cost of any service provided.

The Service Warranty Association license number for CWS Warranty Services, Inc.: 44201034.

While arbitration is mandatory, the outcome of any arbitration shall be nonbinding on the parties, and either party shall, following arbitration, have the right to reject the arbitration award and bring suit in a district court of Oklahoma.

The sentence in the LIABILITY section of this Plan starting with "Once a refund has been issued" is deleted in its entirety and replaced by the following: "Once a refund has been issued for any furniture item, all terms and conditions of the Plan will be fulfilled and all future claims will not be covered."

Item 2. of the SERVICE REQUEST PROCESS is deleted in its entirety and replaced by the following: "2. Your service request must be authorized by Guardian prior to any covered service repair or replacement effort being initiated. Any unauthorized service repair or replacement will rescind coverage for the affected furniture items(s) under the Plan."

**Oregon Residents:** Any arbitration occurring under this Plan shall be voluntary, mutually agreed to, take place in Oregon, and administered in accordance with Oregon law and court rulings. Any award rendered in accordance with this Plan's Arbitration provision shall be a nonbinding award against you, provided that you reject the arbitration decision in writing to us within forty-five (45) days of the arbitrator's award.

**South Carolina Residents:** To prevent any further damage, please refer to the owner's manual. In the event we do not provide covered service within sixty (60) days of filing a claim by you, you are entitled to apply directly to the Insurance Company. If the Insurance Company does not resolve such matters within sixty (60) days of your claim, you may contact the SC Department of Insurance, P.O. Box 100105, Columbia, SC 29202-3105, (800) 768-3467.

**Tennessee Residents:** When there is a failure of the product under the Plan, the Plan shall be extended as follows: (1) the number of days the consumer is deprived of the use of the product by reason of the product being in repair; plus (2) two (2) additional working days.

**Texas Residents:** If you purchased this Plan in Texas, unresolved complaints concerning a provider or questions concerning the registration of a service Plan provider may be addressed to the Texas Department of Licensing and Regulation, P.O. Box 12157, Austin, Texas 78711, telephone number (512) 463-2906 or (800) 803-9202. You may apply for reimbursement directly to the Insurance Company if a covered service is not provided to you by us before the sixty-first (61st) day after the date of your claim, or, a refund or credit is not paid before the forty-sixth (46th) day after the date on which the Plan is returned to the provider. A ten percent (10%) penalty per month shall be added to any refund that is not made to you within forty-five (45) days of return of the Plan to us for cancellation.

You may cancel the Plan at any time. If you cancel the Plan before the 31st day after the date of purchase, we: (1) shall refund to you or credit to your account the full purchase price of the Plan, decreased by the amount of any claims paid under the Plan; and (2) may not impose a cancellation fee. If you cancel the Plan on or after the 31st day after the date of purchase, we: (1) shall refund to you or credit to your account the prorated purchase price of the Plan reflecting the remaining term of the Plan, based on mileage, time, or another reasonably applicable measure of the remaining term that must be disclosed in the Plan, decreased by the amount of any claims paid under the

Plan; and (2) may impose a reasonable cancellation fee not to exceed $50. If we do not pay the refund or credit your account before the 46th day after the date notice of cancellation is received by us, we will pay you a penalty for each month an amount remains outstanding equal to 10 percent of the amount outstanding. The penalty is in addition to the full or prorated purchase price of the Plan that is owed to you. The right to cancel a service contract is not transferable to a subsequent holder of the Plan.

We may cancel the Plan by mailing a written notice of cancellation to you at your last known address according to our records. We must mail the notice before the fifth day preceding the effective date of the cancellation. The notice must state the effective date of the cancellation and the reason for the cancellation. We are not required to provide prior notice of cancellation if the Plan is canceled because of: (1) nonpayment of the consideration for the Plan; (2) fraud or a material misrepresentation by you to us or our administrator; or (3) a substantial breach of a duty by you relating to the furniture item or its use. You are entitled to a prorated refund of the purchase price of the Plan reflecting the remaining term of the Plan, based on mileage, time, or another reasonably applicable measure of the remaining term that must be disclosed in the Plan, decreased by the amount of any claims paid under the contract. We may not impose a cancellation fee.

Texas License Number of the Administrator: 217

**Utah Residents: NOTICE. This Plan is subject to limited regulation by the Utah Insurance Department.** To file a complaint, contact the Utah Insurance Department. Coverage afforded under this Plan is not guaranteed by the Utah Property and Casualty Guarantee Association. The following replaces the conditions pertaining to cancellation of the Plan by us in the Cancellation section: This Plan may be cancelled by us only due to nonpayment of premium or, if the Plan has not been previously renewed or has not been in effect less than sixty (60) days when the written notice of cancellation is mailed or delivered, we may cancel the Plan due to: a) material misrepresentation; b) substantial change in the risk assumed, unless we should reasonably have foreseen the change or contemplated the risk when entering into the Plan; or c) substantial breaches of contractual duties, conditions, or warranties. If we cancel this Plan due to nonpayment, cancellation will be no sooner than ten (10) days after the delivery or first class mailing of written notice. Otherwise, cancellation will be no sooner than thirty (30) days after the delivery or first class mailing of written notice. Cancellation notice will include the reasons for the cancellation.

Paragraph 2 of the SERVICE REQUEST PROCESS section is deleted in its entirety and replaced by the following: Failure to report and provide the necessary information on a covered claim to us within the prescribed time will not invalidate the claim if you can show that notification was not reasonably possible. If an emergency repair is initiated by you, without our knowledge, outside normal business hours, you must notify us as soon as

reasonably possible and you will be responsible for providing any documentation reasonably required by us to fulfill our obligations to you under this Plan; provided however in no event will we be liable for any emergency repairs in an amount in excess of the Limit of Liability under the terms of this Plan. All service requests must be authorized by Guardian prior to any covered service repair or replacement effort being initiated. Other than an emergency repair, any repairs not authorized by us will void coverage for the related claim.

The third paragraph ("If the retailer from whom this Plan was purchased...") of the LIABILITY section is deleted in its entirety.

All service repairs will be made using manufacturer's parts. If not reasonably available, non-manufacturer's parts will be used.

The **"Insurance Securing this Plan"** section is deleted and replaced by the following:   **Insurance Securing this Plan:** This is not an insurance policy. This Plan is secured by a contractual liability policy provided by Continental Casualty Company, 151 N Franklin St., Chicago, IL 60606, 1-800-831-4262. Should we fail to pay or provide service on any claim within sixty (60) days after proof of loss has been filed, you are entitled to make a claim directly against the Insurance Company.

The **Arbitration** section is replaced by the following: Any matter in dispute between you and us may be subject to arbitration as an alternative to court action pursuant to the rules of the American Arbitration Association (or other recognized arbitrator), a copy of which is available on request from us. Any decision reached by arbitration shall be binding upon both you and us. The arbitration award may include attorney's fees if allowed by state law and may be entered as a judgment in any court of proper jurisdiction.

**Vermont Residents:** If you are the original purchaser of this Plan, you have the right to return the Plan within at least twenty (20) days of the receipt of the Plan. If no claim has been made under the Plan, the Plan shall be void and we shall refund to you the full purchase price of the Plan. Any civil action or alternative dispute resolution procedure brought by you in connection to the Plan can be brought in Vermont.

**Washington Residents:** If you are the original purchaser of the Plan, you have the right to return the Plan within at least twenty (20) days of the date of mailing of the Plan to you or within at least ten (10) days if the Plan is delivered to you at the time of the sale or within a longer time period permitted under the Plan. If no claim has been made under the Plan, the Plan shall be void and we shall refund to you the full purchase price of the Plan, plus a ten percent (10%) penalty per month shall be added to any refund that is not made to you within thirty (30) days of return of the Plan to us for cancellation. If we fail to act on your claim, you may contact Continental Casualty Company directly at 1-800-

831-4262. You are not required to wait sixty (60) days before filing a claim directly with Continental Casualty Company. If we cancel this Plan, we shall mail a written notice to you at your last known address contained in our records at least twenty-one days prior to cancellation us. The notice shall state the effective date of the cancellation and the true and actual reason for the cancellation. Any civil action or alternative dispute resolution procedure brought by you in connection to the Plan can be brought in Washington at a location in closest proximity to your permanent residence. A person, such as a bank, savings and loan association, lending institution, manufacturer, or seller shall not require the purchase of a service contract as a condition of a loan or a condition for the sale of any property.

**Wisconsin Residents: THIS CONTRACT IS SUBJECT TO LIMITED REGULATION BY THE OFFICE OF THE COMMISSIONER OF INSURANCE.** This Plan shall not be cancelled due to unauthorized repair of the furniture item, unless we are prejudiced by your failure to obtain such authorization. We will not deny your claim solely because you did not obtain pre-authorization if we are not prejudiced by your failure to notify us.

In the event of a total loss of the furniture item covered by this Plan that is not covered by a replacement of the furniture item pursuant to the terms of this Plan, you shall be entitled to cancel the Plan and receive a pro rata refund of any unearned provider fee, less any claims paid.

For any reason other than the above, you have the right to return the Plan within at least twenty (20) days of the date of mailing of the Plan to you or within at least ten (10) days if the Plan is delivered to you at the time of the sale or within a longer time period permitted under the Plan. If no claim has been made under the Plan, the Plan shall be void and we shall refund to you the full purchase price of the Plan, plus a ten percent (10%) penalty per month shall be added to any refund that is not made to you within forty-five (45) days of return of the Plan to us for cancellation. Subsequent to the period specified above or if a claim has been made under the Plan, you have the right to cancel the Plan and receive a 100% refund of the unearned Plan purchase price, less any claims paid. We may charge a reasonable administrative fee for the cancellation, which may not exceed 10% of the Plan purchase price.

This service contract may be cancelled by us only for nonpayment of our fee, material misrepresentation by you to us or the Administrator, or substantial breach of duties by you relating to the covered product or its use. We shall mail a written notice to you at your last-known address contained in our records at least five (5) days prior to cancellation by us. Such cancellation shall state the effective date of the cancellation and the reason for the cancellation. If we cancel for a reason other than nonpayment of our fee, we shall refund to you 100% of the unearned Plan purchase price, less any claims paid. We may charge a reasonable administrative fee for the cancellation, which may not exceed 10 percent of the Plan

purchase price.

Obligations of the provider under this service contract are insured under a service contract reimbursement insurance policy. If we do not provide, or reimburse or pay for, a service that is covered under this service contract within 60 days after you provide proof of loss, or if we become insolvent or otherwise financially impaired, you may file a claim directly with the service contract reimbursement insurer, Continental Casualty Company, for reimbursement, payment , or provision of service. You can do this by phoning or mailing Continental Casualty Company at 151 N Franklin St., Chicago, IL 60606, 1-800-831-4262.

The sentence "This Plan is evidence of a transaction in interstate commerce and the Federal Arbitration Act applies to and governs the enforcement of any arbitration hereunder" in the Arbitration paragraph of this Plan is deleted in its entirety.

Accidental Damage from Handling covers breakdowns such as: drops, liquid spills and cracked screens. There is no deductible that you are required to pay under this contract.

**Wyoming Residents:** This Plan will be considered void and we will refund you the full purchase price of the Plan or credit your account if you have not made a claim under this Plan and you have returned the Plan to us a) within 20 days after the date we have mailed the Plan to you, b) within 10 days after you have received the Plan if the Plan was furnished to you at the time the Plan was purchased, or c) within a longer time period if specified in the Plan. A ten percent (10%) penalty per month shall be added to a refund that is not paid or credited within forty-five (45) days after return of the Plan to us. This right to void the Plan applies only to the original Plan purchaser and is not transferable. The Arbitration provision in this Plan is replaced with the following: "If there are disputes between you and us that are not resolved by negotiations, you and we may in a separate written agreement voluntarily consent to arbitration. Any arbitration proceedings shall be conducted within the state of Wyoming." For the purpose of this Arbitration provision, references to "we" and "us" include the Plan Obligor and Administrator, as defined above, and their respective parents, subsidiaries, affiliates, service contract insurers, agents, employees, successors and assigns. A person, such as a bank, savings and loan association, lending institution, manufacturer or seller of any product, shall not require the purchase of a service contract as a condition of a loan or a condition for the sale of any property.

CWS-SC-CG-G1T-1.0 (ed. 07-17)