UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

KRISTIE BROWNELL, *individually and
on behalf of all others similarly situated*,

                              **Plaintiff,**

                v.                                  5:22-CV-1199
                                                        (FJS/ATB)

STARBUCKS COFFEE COMPANY,

                              **Defendant.**
_____

**APPEARANCES**                                               **OF COUNSEL**

**COSTELLO, COONEY & FEARON, PLLC**        **PAUL G. FERRARA, ESQ.**
211 West Jefferson Street                             **DANIEL R. ROSE, ESQ.**
Syracuse, New York 13202
Attorneys for Respondents
Spencer Sheehan and
Sheehan & Associates, P.C.

**ASHLEY FURNITURE INDUSTRIES, LLC**      **ROBERT AMICONE, ESQ.**
1670 East 8th Avenue
Tampa, Florida 33605
*Amicus curiae*

**SCULLIN, Senior Judge**

**MEMORANDUM-DECISION AND ORDER**

**I. BACKGROUND**

      Plaintiff Kristie Brownell alleged in her November 13, 2022 complaint that Defendant Starbucks Coffee Company charged a premium price for its French Roast Ground 100% Arabica Coffee ("the Product") that was higher than similar products based on its misrepresentation that "100% Arabica Coffee" meant that there were no additives, including

added potassium, in the Product.[1]  *See generally* Dkt. No. 1.  On July 12, 2023, the Court issued a Memorandum-Decision and Order granting Defendant's motion to dismiss Plaintiff's complaint in its entirety pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  *See* Dkt. No. 24.  The Court found that Plaintiff's allegations failed to show that the Product, in fact, contained added potassium.  *See id.* at 11.  Additionally, the Court found that Plaintiff's vague references in her complaint to "[r]ecent reports based on laboratory analysis," which did not identify the reports or results of that analysis, were too bare or conclusory to state a claim for relief.  *See id.*  Alternatively, even if Plaintiff had plausibly alleged that there was heightened potassium, the Court found that Plaintiff did not show that a reasonable person would believe that "100% Arabica Coffee" meant that the Product contained ground coffee beans without any vitamins or minerals because "Arabica" simply refers to the plant from which the coffee bean was harvested.  *See id.*

After coming to these conclusions, the Court then initiated sanction proceedings *sua sponte*, in which it issued a show-cause order as to why it should not sanction Plaintiff's counsel, Spencer Sheehan, Esq., of Sheehan & Associates, P.C., for filing a frivolous lawsuit in this District.  *See id.* at 17-19.  The Court noted that, in considering Defendant's motion to dismiss and preparing its Memorandum-Decision and Order, the Court learned that Mr. Sheehan had filed no fewer than 18 actions in the Northern District of New York since 2021, all of which were proposed class action lawsuits, and none of which had proceeded past the motion to dismiss phase of litigation.  *See id.* at 17.  The Court pointed out that, in many cases, Mr. Sheehan appears to swiftly seek voluntary dismissals before the defendant even files an answer

---

[1] Plaintiff admitted in her complaint that a "normal" cup of coffee allegedly contains 116 milligrams of potassium.  *See* Dkt. No. 1 at ¶ 14.

or a dispositive motion. *See* Dkt. No. 24 at 18. The Court further referenced recent cases from the Southern District of New York, in which at least one judge admonished Mr. Sheehan for filing dozens of cases similar to the one in *Brownell* in the past several years throughout the Second Circuit, with numerous courts dismissing near-identical challenges. *See id.*

Based on all of this information, the Court concluded that "Mr. Sheehan [was] aware that he file[d] class action lawsuits primarily pertaining to allegedly false labeling on consumer products – including causes of action for violations of [New York's General Business Law ("GBL")] §§ 349 and 350, breach of express and implied warranties and the [Magnuson Moss Warranty Act ("MMWA")], and common law fraud and unjust enrichment – that plainly d[id] not meet the pleading requirements for such claims on their faces." *See id.* Nonetheless, "Mr. Sheehan continue[d] to file these frivolous actions in violation of Rule 11(b)(2) of the Federal Rules of Civil Procedure." *See id.* at 18-19.

On July 23, 2023, Mr. Sheehan submitted a five-page letter brief responding to the Court's order to show cause. *See* Dkt. No. 26. The Court then scheduled a hearing on the order for August 22, 2023, at 10:30 AM, in Syracuse, New York, and ordered Mr. Sheehan to appear. Following the Court's entry of the Text Notice of Hearing, Mr. Sheehan retained Paul G. Ferrara, Esq. and Daniel R. Rose, Esq., of Costello, Cooney & Fearon, PLLC, to represent him (hereinafter "Sheehan's Counsel"). Upon their request, the Court permitted Sheehan's Counsel to file a five-page supplemental submission, which they submitted on August 14, 2023. *See* Dkt. No. 34.

At the hearing on the order to show cause, Sheehan's Counsel argued that it was not Mr. Sheehan's intent to bring a frivolous lawsuit and that he sent the Product for testing at an independent laboratory before filing Plaintiff's complaint. Regarding the former, Sheehan's

Counsel pointed to several cases to support Mr. Sheehan's claim that he had a good faith basis for bringing the lawsuit, but the Court noted that those cases were irrelevant and distinguishable. With respect to the laboratory testing, the Court pointed out that there was no evidence whatsoever in the record that Mr. Sheehan conducted an independent investigation into the Product.

Since the hearing, the Court has received a motion for leave to file an amicus brief from counsel for Ashley Furniture Industries, LLC, which the Court granted and to which Sheehan's Counsel subsequently responded. *See* Dkt. Nos. 36, 37, 39.[2] Additionally, the Court has received Mr. Sheehan's declaration regarding his independent testing of the Product and his attempt to verify Plaintiff's allegations before filing the complaint, which Sheehan's Counsel filed on his behalf, and to which they attached a Certificate of Analysis from Krueger Food Laboratories, Inc. (hereinafter referred to as "the Krueger Report") indicating that a sampled bag of the Product contained a pH value of 6.40. *See* Dkt. Nos. 38, 38-1.

The Court must now consider all of the information before it to determine whether it is appropriate to hold Mr. Sheehan in civil contempt of court and, thus, subject to sanctions pursuant to Rule 11 of the Federal Rules of Civil Procedure.

---

[2] In that amicus brief, the Assistant General Counsel for Ashley Furniture described an apparently frivolous lawsuit Mr. Sheehan filed against it in the Northern District of Florida, to which it threatened to move for sanctions, and Mr. Sheehan responded in an email, provided to this Court, stating the following: "So go file your rule 11 motion [sic] I hear such sanctions threats from people like you all day long." *See* Dkt. No. 36.

## II. DISCUSSION

### A. Legal standard

As the Court noted at the hearing on its order to show cause, it agrees with Mr. Sheehan and Sheehan's Counsel that a bad faith standard applies when determining whether Mr. Sheehan is in contempt. Specifically, the law provides that "[a] court may sanction counsel for signing pleadings whose legal theories are not 'warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law.'" *Weiss v. David Benrimon Fine Art LLC*, __ F. App'x __, 2021 U.S. App. LEXIS 38395, *4 (2d Cir. 2021) (summary order) (quoting Fed. R. Civ. P. 11(b)(2); *see also id.* 11(c)). "'[T]o constitute a frivolous legal position for purposes of Rule 11 sanction, it must be clear under existing precedents that there is no chance of success and no reasonable argument to extend . . . the law as it stands.'" *Id.* (quoting *Mareno v. Rowe*, 910 F.2d 1043, 1047 (2d Cir. 1990)). "The inquiry is one of 'objective unreasonableness and is not based on the subjective beliefs of the person making the statement.'" *Id.* at *5 (quoting *StreetEasy, Inc. v. Chertok*, 752 F.3d 298, 307 (2d Cir. 2014) (citation omitted)).

"A court may, *sua sponte*, 'order an attorney . . . to show cause why conduct specifically described in the order has not violated Rule 11(b).'" *United States ex rel. Hayes v. Allstate Ins. Co.*, 686 F. App'x 23, 27 (2d Cir. 2017) (summary order) (quoting Fed. R. Civ. P. 11(c)(3)). "'If, after notice and a reasonable opportunity to respond, the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction.'" *Id.* (quoting Fed. R. Civ. P. 11(c)(1)). "A district court must make a finding of bad faith before issuing sanctions *sua sponte*." *Id.* (citing *Muhammad v. Walmart Stores E., L.P.*, 732 F.3d 104, 108 (2d Cir. 2013) (per curiam) (citing *In re Pennie & Edmonds LLP*, 323 F.3d 86, 91 (2d Cir. 2003))). "In recent

years, however, courts in this circuit have clarified that the subjective bad faith standard, as applied in the context of *sua sponte* Rule 11 sanctions, requires an attorney to have *actual knowledge* that a pleading or argument that he or she is advancing is frivolous." *Braun v. Zhiguo Fu*, No. 11cv04383 (CM) (DF), 2015 U.S. Dist. LEXIS 90652, *39-*40 (S.D.N.Y. June 19, 2015).

### B. Whether Mr. Sheehan is in contempt of court

When applying this standard, Mr. Sheehan argues that the Court has not provided the requisite "high degree of specificity in [its] factual findings" to support finding him in contempt or sanctioning him. *See* Dkt. No. 26 at 1. The Court disagrees. In its 20-page Memorandum-Decision and Order granting Defendant's motion to dismiss, the Court summarized the allegations in Plaintiff's complaint, identified the relevant rules and applied those rules to the facts with respect to each cause of action, and ultimately decided to dismiss each cause of action. *See generally* Dkt. No. 24. The Court found that Mr. Sheehan filed a frivolous complaint in this action when he made meritless claims in Plaintiff's complaint based on an unreasonable interpretation of a food label and without providing any support for Plaintiff's allegations. *See generally id.*

More precisely, the Court found that Plaintiff's generalized allegations did not plausibly assert that the Product, in fact, contained added potassium. *See id.* at 10-11. For example, the Court pointed out that Plaintiff failed to allege that she suffered any kind of reaction as a result of heightened levels of potassium, or even that she was at higher risk to suffer such issues. *See id.* at 11. The Court also noted that Plaintiff did not cite to or attach any reports to support her assertion that the Product had significantly greater than expected levels of potassium, even

though Plaintiff vaguely alleged that "[r]ecent reports based on laboratory analysis indicated the Product has significantly greater than expected levels of potassium," and, "[a]ccording to those knowledgeable about coffee production, this level is likely intentional, because of potassium's recognized use for this purpose." *See id.* at 10-11 (citing Dkt. No. 1 at ¶¶ 17-18). The only "report" before the Court at the time was a "study" that Plaintiff improperly attached to her memorandum of law in response to Defendant's motion to dismiss in an attempt to incorporate it by reference into her complaint. *See* Dkt. No. 20-1. In a footnote, the Court explained that Plaintiff could not "incorporate by reference" that study when it was not identified in any way in her complaint. *See* Dkt. No. 24 at 10 n.2. The Court noted, however, that, even if it could consider the study Plaintiff provided, such study appeared to be an advertisement for Puroast Coffee Company ("Puroast"), which is a competitor in the coffee market, rather than a scientific study. *See id.* (citing Dkt. No. 20-1). In response to the Court's order to show cause, Sheehan's Counsel claimed that this "study" constituted an independent laboratory analysis. *See* Dkt. No. 34 at 2-3.

Nonetheless, the Court finds that the study appeared to be an article, clearly produced by Puroast Coffee, titled "What is Good Coffee? Its [sic] Certainly Not Starbucks Dark French Roast Laced with Potassium." *See* Dkt. No. 20-1. The article asserts that, in March 2022, while testing in Puroast facility labs, Puroast discovered that Starbucks's French Roast had a pH of 5.74. *See id.* at 3. According to the article, "[a]ll roasted coffee has a pH in the range of 4.9 – 5.2, depending on the bean type (robusta vs arabica), the bean origin (country) and level of roast," with dark roasts having slightly less acid than house blends.[3] *See id.* Puroast Coffee

---

[3] Notably, this sentence makes clear that the pH range of coffee – and any naturally occurring potassium in the product – depends on the *type* of coffee bean, whether it is Robusta or Arabica. This therefore puts into question Plaintiff's assertion, which Mr. Sheehan maintains to this day

then allegedly provided three of its own coffee samples and two Starbucks coffee samples to the University of North Carolina A&T food science department, which "confirmed the a [sic] pH reading for Starbucks Dark French Roast of 5.74, parallel to Puroast's French Roast with a pH of 5.8." *See id.* Based on this finding, the article boldly assumes that "Starbucks adds Potassium to Coffee and Doesn't Tell Anyone," adding the assertion that "Puroast is the only coffee that's naturally smooth tasting *and* low acid[.]" *See id.* at 4. Puroast calls out Starbucks as a "big company" that "is basically cheating – throwing chemicals into their coffee so that it will imitate the same smooth taste and low acid, that we, Puroast, make naturally." *See id.*

If Mr. Sheehan relied on any other independent "studies" or lab analyses that he failed to attach to Plaintiff's complaint or her memorandum of law in response to Defendant's motion to dismiss, he had the opportunity to correct this error and point to such testing in response to the Court's order to show cause. Instead, at the show cause hearing, Sheehan's Counsel admitted that neither Mr. Sheehan nor his counsel included the report in their responses, yet they boldly informed the Court that Mr. Sheehan sent the Product for testing at an independent laboratory. When the Court asked Sheehan's Counsel whether anything in the record reflected the independent laboratory report Mr. Sheehan allegedly obtained, Sheehan's Counsel stated that he could provide it to the Court as a supplement.

Subsequently, Sheehan's Counsel supplemented their response to include Mr. Sheehan's declaration in opposition to the Court's show cause order and the Krueger Report. *See* Dkt.

---

is reasonable, that a reasonable customer would believe "100% Ground Arabica" to represent that there was no potassium, vitamins, or minerals to the coffee beyond the "116 milligrams of potassium" that "[a] normal cup of coffee contains." *See* Dkt. No. 1 at ¶ 14. As the Court noted in its Memorandum-Decision and Order and is clear based upon this "study," the phrase "100% Ground Arabica" identifies that the coffee is made with 100% coffee beans from the Arabica coffee plant (rather than the Robusta plant), and those beans have been ground for brewing.

Nos. 38, 38-1. In Mr. Sheehan's declaration, he attested that, on November 1, 2022, the New York Post published an article entitled, "Starbucks Secret: Dark French Roast 'is not 100% coffee,' says complaint," in which the newspaper "reported about a complaint filed with the North Carolina Department of Justice's Consumer Protection Division claiming that the Product significantly exceeded expected potassium levels compared with other similar coffee beans sold at retail locations. *See* Dkt. No. 38 at ¶ 2 (citing *Starbucks Secret: Dark French Roast 'is not 100% coffee,' says complaint*," N.Y. Post, Nov. 1, 2022, available at https://nypost.com/2022/11/01/starbucks-dark-french-roast-is-not-100-coffee-complaint/ (last accessed Nov. 29, 2023)). According to Mr. Sheehan, Puroast filed the complaint after obtaining "'independent laboratory tests conducted in August [of 2022] by Salam A. Ibrahim, Ph.D.,' the head of the Food Science Department at North Carolina Agricultural and Technical (A&T) State University, which had revealed potassium levels in Starbucks Dark French Roast coffee to be more than fourteen (14) standard deviation points above other national brands tested, suggesting the artificial addition of potassium during processing." *See id.* at ¶ 5. Mr. Sheehan believed that Dr. Ibrahim used "'accepted scientific peer review methodology and relied on sophisticated analytical equipment," and he reviewed Dr. Ibrahim's employee page to find that he was a widely published Research Professor with North Carolina A&T's College of Agricultural and Environmental Sciences. *See id.* at ¶¶ 6-7. Mr. Sheehan declares that *Business Insider* also published information about Puroast's complaint, including that its studies showed that Starbucks Dark French Roast coffee contained 70% less acid than regular coffee, which prompted Dr. Ibrahim to conduct independent testing that revealed the coffee contained 6,800 ppm of potassium compared to just 6,000 ppm in other tested coffees. *See id.* at ¶¶ 8-9.

Mr. Sheehan further asserts that, following his review of the above-stated publicly available information regarding Puroast's studies, he "investigated the complainant to determine if it was a credible source." *See id.* at ¶ 10. Mr. Sheehan relied upon a 2006 study from the University of California, Davis, and its researchers' testing of Puroast's coffee, to conclude that Puroast's studies "had some level of legitimacy, and the allegations made within [its] complaint against industry giant Starbucks were not raised lightly." *See id.* at ¶¶ 11-14. Mr. Sheehan also attests that he researched Defendant's disclosure obligations, in which he reviewed the Food and Drug Administration's ("FDA") regulations to determine whether Defendant was exempt from labeling requirements, such as if the potassium constituted a "processing aid" that would "not significantly increase the amount of the constituents naturally found in the food." *See id.* at ¶ 16. Mr. Sheehan contends that, in his view, "there was a close factual question whether the increased potassium levels were 'significant' enough to require disclosure under those regulations." *See id.* Based on his research, Mr. Sheehan also believed that Defendant could raise a preemption defense, so he reviewed 1 N.Y.C.R.R. § 259.1, in which New York's Agriculture and Markets Law adopted the FDA food labeling regulations, and he concluded that he could "adequately respond to any preemption defense." *See id.* at ¶ 17.

Next, Mr. Sheehan asserts that he reviewed caselaw from the Second Circuit and district courts within it, as well as persuasive authority from other jurisdictions, "supporting the legal theories set forth in the Complaint." *See id.* at ¶ 18. Mr. Sheehan argues that, although the Court ultimately disagreed with his analysis of the caselaw supporting Plaintiff's claims, he submits that Plaintiff's complaint "was not filed in bad-faith or without any basis in established case law, or a reasonable argument for an extension thereof." *See id.* In total, Mr. Sheehan attests that he "devoted between thirty (30) and forty (40) hours to the above factual and legal

research into the allegations of Starbucks adding potassium to its French Dark Roast coffee to lower acidity levels, at a value to [his] client of $15,000-20,000." *See id.* at ¶ 19.

Finally, Mr. Sheehan affirms that, after Defendant's counsel accepted service of Plaintiff's complaint, he "engaged [his] own independent analysis" of the Product in advance of any Answer or motion practice. *See id.* at ¶ 22. Mr. Sheehan asserts that, although he was "unable to obtain an analysis as sophisticated as that conducted by Puroast and Dr. Ibrahim, [he] made other efforts to verify the claims at issue by requesting a pH analysis of eight different French dark roast coffees from an experienced food laboratory, Krueger Food Laboratories, Inc., in Massachusetts. *See id.* at ¶ 23. Mr. Sheehan declares that, of those eight samples, the Product had the highest pH at 6.40, compared with values of 5.70 to 6.20 for the other coffees tested, which were "significantly higher" results than those Dr. Ibrahim obtained, but he attributes those differences "to the environment in which the testing was done: a commercial laboratory with a wide range of services, compared to a major university laboratory with specialized equipment and years of experience performing the procedures in question." *See id.* at ¶¶ 24-26. Notwithstanding these differences, Mr. Sheehan attests that the Product was the highest, most alkaline, and least acidic coffee that he tested, which corroborated Puroast's allegations; and, therefore, he "believed there was a good-faith basis to commence and maintain the action against [Defendant] for its misleading '100% Arabic[a] Coffee' claim." *See id.* at ¶¶ 27-28. Sheehan's Counsel have also provided the Krueger Report, which included the pH analyses for all eight French roast dark roast coffees. *See* Dkt. No. 38-1 at 2-9. Notably, the Krueger Report is dated April 27, 2023, with a receipt date of January 30, 2023. *See* Dkt. No. 38-1. Plaintiff commenced this action on November 13, 2022, more than two months before the Krueger Report indicated that it received the Product sample. *See* Dkt. No. 1.

As noted above, neither the Krueger Report nor any of the articles or studies Mr. Sheehan pointed to in his declaration were attached to Plaintiff's complaint or her response in opposition to Defendant's motion, nor did Mr. Sheehan provide them to the Court in his initial responses to the Court's order to show cause prior to the hearing. The Court stated as such in its Memorandum-Decision and Order:

> Plaintiff does not cite to any of those reports or attach them to her complaint. She does not point to any figure or other data set showing the amount of potassium in the Product. She does not allege that she suffered any kind of reaction as a result of heightened levels of potassium in the coffee, or that she has kidney issues and may have suffered a reaction. To the extent Plaintiff has alleged that she paid a pri[c]e premium for coffee free from added potassium, her vague allegations do not show that the Product, in fact, contains added potassium. The Court therefore finds that a vague reference to "[r]ecent reports based on laboratory analysis" without identifying those reports or results of that analysis are bare and conclusory assertions that, even if accepted as true, do[] not plausibly state a claim for relief as required under Rule 8 of the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 8; *Ashcroft v. Iqbal*, 556 U.S. 662, 678-81 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Hoffman v. Kraft Heinz Foods Co.*, No. 22-CV-397 (KMK), 2023 U.S. Dist. LEXIS 20929, *24-*25 (S.D.N.Y. Feb. 7, 2023).

*See* Dkt. No. 24 at 10-11 (footnote omitted).

Even if the Court had such information available to it at the time it considered Defendant's motion to dismiss and accepted such evidence as true, the Court ruled that Plaintiff "ha[d] not shown that a reasonable person would believe that "100% Arabica Coffee" meant that the Product contained ground coffee beans without any vitamins or minerals, including added potassium." *See id.* at 11. The Court noted that Plaintiff herself admitted that a "normal" cup of coffee contains 116 milligrams of potassium. *See id.* (citing Dkt. No. 1 at ¶ 14). The Court also pointed to Defendant's correct assertion that the word "Arabica" simply refers to the

plant from which the coffee bean was harvested. *See id.* (citing Dkt. No. 14-1 at 21). Specifically, the Court quoted from two dictionary definitions of the word "Arabica," meaning a "'coffee tree, *Coffea arabica*, native to Ethiopia but extensively cultivated in tropical climates,'" and "'the coffee beans produced by this tree, and the typically mild-flavoured, high-quality coffee obtained from them.'" *See id.* at 11, 12 n.3 (quoting *Arabica, Oxford English Dictionary* (3rd ed. 2013); citing *Arabica*, *Merriam-Webster's Dictionary*, https://www.merriam-webster.com/dictionary/arabica (last accessed July 6, 2023)). Based on the foregoing, the Court found that "a reasonable consumer acting under reasonable circumstances would understand the labeling of '100% Arabica Coffee' on the Product to mean that the ground coffee beans are exclusively from the arabica plant, and the Product does not contain coffee beans from any other type of coffee bean producing plant," and "a reasonable consumer would not assume '100% Arabica Coffee' means coffee without additives, vitamins, or minerals." *See id.* at 12.

The Court relied on this reasoning to dismiss Plaintiff's GBL §§ 349 and 350 claims, as well as her claims for breach of express and implied warranties, violation of the Magnuson Moss Warranty Act, and for fraud and unjust enrichment. *See id.* at 17-17. Additionally, in assessing Plaintiff's State Consumer Fraud Acts claim, the Court noted that Plaintiff never identified the "Consumer Fraud Acts" she alleged Defendant violated or how Defendant allegedly did so. *See id.* at 13. The Court found that, without such basic factual contentions, Plaintiff fell short of satisfying Rule 8's pleading requirements on that claim. *See id.*

In its discussion regarding sanctions, the Court pointed to Mr. Sheehan's failures in this action and in others before courts in this District and within the Second Circuit to find that "Mr. Sheehan is aware that he files class action lawsuits primarily pertaining to allegedly false labeling on consumer products – including causes of action for violations of GBL §§ 349 and

350, breach of express and implied warranties and the MMWA, and common law fraud and unjust enrichment – that plainly do not meet the pleading requirements for such claims on their faces." *See id.* at 18. "Nonetheless," the Court asserted, "Mr. Sheehan continues to file these frivolous actions in violation of Rule 11(b)(2) of the Federal Rules of Civil Procedure." *See id.* at 19. Thus, based on "Mr. Sheehan's history and experience in similar cases, which courts have dismissed for failure to state a claim as this Court does here," the Court ordered that Mr. Sheehan must show cause as to why he should not be sanctioned for continually filing frivolous lawsuits in this District. *See id.*

In responding to the Court's order to show cause, Mr. Sheehan pointed to the caselaw on which he allegedly relied to support filing Plaintiff's complaint in this action and which, he argued, showed that his conduct was done in good faith. Most notably, Mr. Sheehan argued that Plaintiff's claims were not frivolous and were consistent with the Second Circuit's findings in its recent decision in *Mantikas v. Kellogg Co.*, 910 F.3d 633, 637 (2d Cir. 2018). *See* Dkt. No. 26 at 3. Mr. Sheehan pointed to the Second Circuit's reliance in that case on the Ninth Circuit's rule that "'[r]easonable consumers should [not] be expected to look beyond misleading representations on the front of the box to discover the truth from the ingredient list in small print on the side of the box.'" *Mantikas*, 910 F.3d at 637 (quoting *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 939 (9th Cir. 2008)). In *Mantikas*, the Second Circuit held that the plaintiffs had stated a plausible claim because Cheez-It crackers' labeling as "WHOLE GRAIN" and "MADE WITH WHOLE GRAIN" – and disclosures on a side panel that there were 5 or 8 grams of whole grains per serving size – "falsely imply that the grain content is entirely or at least predominantly whole grain, whereas in fact, the grain component consisting of enriched white flour substantially exceeds the whole grain portion." *Id.* The Second Circuit thus "conclude[d]

that a reasonable consumer should not be expected to consult the Nutrition Facts panel on the side of the box to correct misleading information set forth in large bold type face on the front of the box." *Id.*  The Court finds that the Second Circuit's holding is not applicable to Plaintiff's case, in which the Product stated that it contained "100% Ground Arabica" coffee, meaning ground coffee beans from the Arabica coffee plant; and it did, in fact, contain that content without need for correction on the side of the bag or in a list of nutritional facts.[4]

Mr. Sheehan next pointed to *Sharpe v. A&W Concentrate Co.*, 481 F. Supp. 3d 94 (E.D.N.Y. 2020), arguing that, "[u]nlike 'in *Mantikas*, [where] it was undisputed that the Nutrition Facts panel was accurate,' 'the existence of [added potassium], the substance [P]laintiff[] allege[d]' makes the '100% Arabica' front label claim misleading, '[wa]s never explicitly disclosed to consumers.'"  *See* Dkt. No. 26 at 4 (quoting *Sharpe v. A&W Concentrate Co.*, 481 F. Supp. 3d 94, 102 (E.D.N.Y. 2020) ("denying dismissal in case brought by [Mr. Sheehan] because despite claim soda was 'made with aged vanilla,' vanilla taste was provided by the undisclosed synthetic chemical of ethyl vanillin") (citing *Mantikas*, 910 F.3d at 637; kt. No. 1 at ¶ 20)).  In *Sharpe*, the court found that the rule from the *Mantikas* case applied when the A&W root beer label stated that it was "made with aged vanilla."  *Sharpe*, 481 F. Supp. 3d at 102.  According to that court, "the use of the word 'aged' suggests to consumers that the

---

[4] Notably, bags of ground coffee beans are not required to contain Nutritional Fact panels.  In the FDA's regulations, it exempts certain foods from special labeling requirements, such as for "[f]oods that contain insignificant amounts of all of the nutrients and food components required to be included in the declaration of nutrition information," provided that the food "bears no nutrition claims or other nutrition information in any context on the label or in labeling or advertising," with some exceptions.  21 C.F.R. § 101.9(j)(4).  According to the regulations, "[a]n insignificant amount of a nutrient or food component shall be that amount that allows a declaration of zero in nutrition labeling, except that for total carbohydrate, dietary fiber, and protein, it shall be in an amount that allows a declaration of 'less than 1 gram.'"  *Id.*  The regulations point to "coffee beans (whole or ground)" as an example of one such exempted food.  *Id.*

vanilla content is naturally derived and has acquired a desirable quality upon the passage of time. By holding out their products as containing 'aged vanilla,' defendants' representation is the equivalent to stating the beverages are 'Made With Natural Vanilla,'" which was false as natural vanilla was "*de minimis* in quantity when compared to the artificial and synthetic substitute for vanilla." *Id.*

The Court also finds that this case is irrelevant for the same reason as *Mantikas*. There is no assertion that the "100% Ground Arabica" coffee in Plaintiff's case contained Robusta coffee beans in addition to Arabica coffee beans. This is not a case where the labeling promised inclusion of one ingredient, but that ingredient was de minimus in quantity. There was one ingredient promised on the label, and the Product only contained one ingredient: ground Arabica coffee beans. The Court therefore finds that it was unreasonable for Mr. Sheehan to believe that *Mantikas* and *Sharpe* provided precedent he could follow in filing Plaintiff's claim since they were not relevant to this action.

Mr. Sheehan also pointed to nonbinding decisions about "100%" claims that allegedly supported extensions of law and showed that Plaintiff's claims were not frivolous. *See* Dkt. No. 26 at 4. Specifically, Mr. Sheehan identified three cases from the 7th Circuit and the districts within that Circuit. First, Mr. Sheehan pointed to *Bell v. Publix Super Mkts., Inc.*, 982 F.3d 468, 473 (7th Cir. 2020), in which the plaintiffs filed suit claiming that the defendants' products, labeled "100% Grated Parmesan Cheese," were deceptive because the fine print on the back of the products showed that they were not 100% cheese. *Bell*, 982 F.3d at 474. The Seventh Circuit in *Bell* rejected the district court's proposed "rule that immunized any ambiguous label so long as it is susceptible to one non-deceptive interpretation" and adopted the Second Circuit's reasoning in *Mantikas* that such a rule "'would validate highly deceptive advertising.'" *Id.* at

477 (quoting *Mantikas*, 910 F.3d at 638). However, the Seventh Circuit noted, "where plaintiffs base deceptive advertising claims on unreasonable or fanciful interpretations of labels or other advertising, dismissal on the pleadings may well be justified." *Id.* (collecting cases). In reversing the district court's dismissal of the plaintiffs' claim, the Seventh Circuit noted that it could "see how '100% Grated Parmesan Cheese' might be interpreted as claiming only that whatever it contains is '100% grated,' or perhaps that whatever cheese it contains is '100% Parmesan[,]'" or even "that '100%' applies to all three words: it's all cheese; all the cheese is Parmesan, and it's all grated." *Id.* at 476-77. In this case, however, the label "100% Ground Arabica Coffee" unambiguously means that it contains 100% ground coffee (*i.e.*, there were no whole beans present) and that the coffee was made of 100% Arabica coffee beans, of which there is no dispute.

In *Bell*, the Seventh Circuit also pointed to its recent decision in *Beardsall v. CVS*, 953 F.3d 969 (7th Cir. 2020), to support "the general principle that deceptive advertising claims should take into account all the information available to consumers and the context in which that information is provided and used." *Id.* at 477 (citing *Beardsall*, 953 F.3d at 977-78 (affirming summary judgment for defendants where plaintiffs testified that they expected products to contain preservatives despite label claiming '100% pure' aloe) (other citations omitted)). Mr. Sheehan also pointed to the *Beardsall* case to support Plaintiff's claims here, even though, in *Beardsall*, the Seventh Circuit granted the defendants' motion for summary judgment after finding that the plaintiffs had not proffered evidence to show that a reasonable consumer would interpret the statement "100% Pure Aloe Vera Gel" to mean that there were no stabilizers or preservatives in the product. *See Beardsall*, 953 F.3d at 977. These cases show examples of potentially false labels indicating that products contain one ingredient when they

contain more than that, which is separate from the issue in Plaintiff's case, in which the Product did not contain any ingredients other than ground coffee beans from the Arabica coffee plant, and Plaintiff does not argue otherwise. Thus, the Court finds that it would have been unreasonable for Mr. Sheehan to rely on these cases to support his position that he believed that Plaintiff's case was nonfrivolous.

Lastly, with respect to these "100%" cases, Mr. Sheehan pointed to *Jackson v. Dole Packaged Foods, LLC*, No. 3:22-CV-1448-DWD, 2022 U.S. Dist. LEXIS 233999 (S.D. Ill. Dec. 30, 2022), to support his argument that Plaintiff's claims were not frivolous. *See* Dkt. No. 26 at 4. Although *Jackson* is the most analogous case to Plaintiff's claims in that the plaintiff alleged that the label "100% fruit juice" was misleading because it contained ascorbic and citric acids as preservatives and additives, *see Jackson*, 2022 U.S. Dist. LEXIS 233999, at *12, the Court finds that Mr. Sheehan could not have relied on that decision because he filed Plaintiff's complaint on November 13, 2022, before the court issued its decision in *Jackson, see generally* Dkt. No. 1.

Notwithstanding this fact, the Court considers the decision in *Jackson* and finds that there is a key distinguishing feature. In *Jackson*, if the defendant added chemically-manufactured acids to the product – even though they are naturally occurring in fruit – then there is a valid argument that the product no longer contains "100% juice." It would be fruit juice, plus added acids. However, in this case, even if Plaintiff alleged that Defendant added chemically-manufactured potassium to the Product – which, as the Court found in its Memorandum-Decision and Order, she did not – it would not change the fact that Product was

made entirely of beans from the Arabica coffee plant.[5] Plaintiff has not alleged that the coffee beans are from the Robusta or any other type of coffee plant other than Arabica. Thus, as the Court explained in its Memorandum-Decision and Order, even if Plaintiff had alleged that Defendant added potassium to its coffee, she did not allege that a reasonable consumer would understand "100% Arabica Coffee" as meaning anything other than coffee that is entirely from the Arabica coffee plant. As such, even if Plaintiff's counsel could have relied on *Jackson*, the Court finds that Mr. Sheehan has failed to establish its relevance in showing that it was foreseeable that Plaintiff's claim would survive in this Court.

In sum, Mr. Sheehan filed Plaintiff's complaint without any studies, relevant caselaw, or reasonable interpretations of the wording on the Product label to support the allegations contained within. Accordingly, for the above-stated reasons, and those the Court articulated during the show cause hearing, the Court concludes that Mr. Sheehan acted in bad faith when he commenced this action; and, as such, the Court holds Mr. Sheehan in contempt for his conduct in this matter.

### III. CONCLUSION

After carefully considering the entire file in this matter, the parties' submissions and oral arguments, and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Attorney Spencer Sheehan, of Sheehan & Associates, P.C., is in civil contempt of court; and the Court further

---

[5]As another example, even if the bag of coffee contained artificial flavoring, such as vanilla or caramel, the Product would still contain "100% Arabica coffee" so long as the coffee beans entirely derived from the Arabica coffee plant.

 **RESERVES** decision on the nature of the final sanctions.

**IT IS SO ORDERED.**

Dated: November 30, 2023
    Syracuse, New York

*/s/ Frederick J. Scullin, Jr.*
Frederick J. Scullin, Jr.
Senior United States District Judge